LEXSEE 2001 US APP LEXIS 18935

DARYL L. VAUGHN, Plaintiff-Appellant, v. CITY OF LEBANON, et al., Defendants-Appellees.

Nos. 99-6670, 99-6672, 99-6673, 99-6675, 99-6676

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

*18 Fed. Appx. 252; 2001 U.S. App. LEXIS 18935*

August 16, 2001, Filed

**NOTICE:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE. 96-00252/96-00822/96-00823/96-00824. Trauger. 11-15-99/11-12-99.

**DISPOSITION:** District court's grant of summary judgment to defendants in these five separate causes of action, AFFIRMED IN PART AND REVERSED IN PART and REMANDED.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For DARYL I. VAUGHN, Plaintiff - Appellant (99-6670, 99-6672, 99-6673, 99-6675, 99-6676): Chantal M. Eldridge, Cookeville, TN.

For SCOTT BOWEN, Defendant - Appellee (99-6670, 99-6672): Lela M. Hollabaugh, Waller, Lansden, Dortch & Davis, Nashville, TN.

For CHARLES TOMLINSON, Defendant - Appellee (99-6670, 99-6672, 99-6673, 99-6676): Lela M. Hollabaugh, Waller, Lansden, Dortch & Davis, Nashville, TN.

For CITY OF LEBANON, Defendant - Appellee (99-6670, 99-6672, 99-6673, 99-6675, 99-6676): Lela M. Hollabaugh, Waller, Lansden, Dortch & Davis, Nashville, TN.

For K. D. SMITH, Defendant - Appellee (99-6672, 99-6676): Lela M. Hollabaugh, Waller, Lansden, Dortch & Davis, Nashville, TN.

For BONNIE WELLS, WILLIAM GLOVER, III, Defendants - Appellees (99-6673): Lela M. Hollabaugh, Waller, Lansden, Dortch & Davis, Nashville, TN.

For JACK BARE, Defendant - Appellee (99-6673, 99-6675): Lela M. Hollabaugh, Waller, Lansden, Dortch & Davis, Nashville, TN.

For KENNETH PRESLEY, WILSON COUNTY, TENNESSEE, Defendants - Appellees (99-6673): Joseph R. Wheeler, Thomas I. Carlton, Jr., Rebecca Wells Demaree, Cornelius & Collins, Nashville, TN.

For BILLY WEEKS, Defendant - Appellee (99-6675): Lela M. Hollabaugh, Waller, Lansden, Dortch & Davis, Nashville, TN.

**JUDGES:** Before: KENNEDY and DAUGHTREY, Circuit Judges; McKEAGUE, District Judge. *

* The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

**OPINIONBY:** DAVID W. McKEAGUE

**OPINION:** [*255]

EXHIBIT C

**DAVID W. McKEAGUE, District Judge.**

This case is the appeal of five separate *42 U.S.C. § 1983* causes of action brought by plaintiff Daryl Vaughn against individual officers in the City of Lebanon, Tennessee, Police Department and Wilson County, Tennessee, Sheriff's Department; Lebanon's [**2] Chiefs of Police; the City of Lebanon; and Wilson County. Vaughn claims that excessive force was used against him in a series of arrests that took place in 1995 and 1996. Specifically, Vaughn asserts that he suffered chemical burns, blurred vision, decreased hearing, and headaches after he was repeatedly sprayed with Freeze +P, a brand of pepper spray used by law enforcement officers. He also maintains that the defendants were deliberately indifferent to his serious medical needs.

The district court, acting upon the recommendations of Magistrate Judge William J. Haynes, Jr., granted summary judgment for the defendants on all federal counts. Plaintiff now appeals. For the reasons stated below, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

**I. BACKGROUND**

**A. March 14 and 15, 1995 Arrests (No. 99-6670)**

Vaughn's first exposure to Freeze +P pepper spray took place on March 14, [*256] 1995, and was immediately followed by a second exposure on March 15, 1995. n1

---

n1 Though Vaughn sometimes mistakenly refers to the arrests as having occurred on March 15 and 16, for the sake of clarity, the Court uses only the correct dates.

---

[**3]

Vaughn was arrested on the night of March 14, 1995, by Lebanon Police Officer Scott Bowen. (J.A. 1850, 1908.) During his deposition, Bowen testified that he received a call from his dispatcher that Vaughn was causing a disturbance at a local motel. (J.A. 1850.) Bowen arrived at the hotel to find Vaughn "stumbling around the dumpster." (*Id.*) Bowen noted that Vaughn's "eyes were glassy, blood-shot, speech was slurred," that he smelled strongly of liquor, and that he was unsteady on his feet. (*Id.*) Bowen placed Vaughn under arrest "for his own safety and to keep the peace." (*Id.*) Bowen further testified that Vaughn was "belligerent as usual, nothing threatening . . . nothing physical." (J.A. 1850-51.) Bowen placed handcuffs on Vaughn and took him to the Wilson County Jail. He stated that other than the handcuffs, he used no other form of force, including the use of Freeze +P, to effectuate Vaughn's arrest. (J.A. 1853.)

Vaughn, however, provided a differing account during his deposition. He denied resisting arrest. (J.A. 1909.) He testified that during the arrest, Bowen sprayed him with Freeze +P, then threw him across the hood of the squad car, pulled his hand up to affix [**4] the handcuffs, and twisted Vaughn's thumb out of place. He threw Vaughn into the car face-down and sprayed Freeze +P inside the car. (J.A. 1911.) Vaughn testified that he was sprayed on his face, eyes, neck, and left ear. (J.A. 1912.) He allegedly told Bowen he "couldn't take no more of that shit" and that he had trouble breathing because of the spray. (J.A. 1911.) Vaughn asserted that after he arrived at the Wilson County Jail, he was sprayed for a second time by Wilson County Deputy Sheriff Kenneth Presley, who was waiting for him at the back door. Presley allegedly sprayed him again when Vaughn was in the drunk tank. n2 (J.A. 1953.) Vaughn did not seek medical treatment immediately after the March 14 arrest.

---

n2 Vaughn did not name Presley as a defendant in this action (No. 99-6670), though he is a defendant in the case resulting from Vaughn's April 1, 1995, arrest (No. 99-6673).

---

Vaughn was again arrested the following night. Bowen testified he received a call that a white male with red hair was walking down [**5] South Maple Street knocking on doors. (J.A. 1855.) Bowen responded to the call and found Vaughn "stumbling down the street . . . highly intoxicated." (*Id.*) Bowen arrested Vaughn for his own safety, placed handcuffs on him, and put him in the squad car. (J.A. 1855-56.) Bowen noted that Vaughn was not threatening in any way, and that he responded to the officer's verbal commands. (J.A. 1856.) Bowen denied using pepper spray on Vaughn. (J.A. 1857.) He testified that Vaughn did not behave in any manner that would justify using pepper spray on him while in Bowen's presence, and did not believe that Vaughn was sprayed at the Wilson County jail that night. (J.A. 1859.)

Vaughn testified that on March 15, he was walking to a nearby graveyard to visit his mother's and sister's graves. (J.A. 1954.) He admitted he had been drinking. (*Id.*) Bowen approached and asked him if he had been knocking on doors. (J.A. 1965.) Vaughn denied doing so. (*Id.*) Bowen then performed a field sobriety test, determined that Vaughn was drunk, put handcuffs on him, and allegedly bent Vaughn over the hood of his car and sprayed him with Freeze +P in the face, across the forehead and nose and in his [*257] eyes [**6] and left ear. (J.A. 1965, 1970-71.) Vaughn asserted that during

the arrest, he was either struck by Bowen or hit his head on the car, causing a "split place" on his forehead. (J.A. 1969.) After arriving at the Wilson County Jail, he was allegedly greeted at the back door by Presley, who said "Vaughn again" and sprayed him with Freeze +P. (J.A. 1978.) Vaughn alleged that Presley sprayed him a second time in the drunk tank. (J.A. 1983.) Vaughn denied resisting arrest in any way, or that he was drunk that evening. (J.A. 1967.)

After he was released from jail on March 16, Vaughn's father took him to the emergency room at the University Medical Center in Lebanon, where he was prescribed antibiotics and a cream for his burns, and referred to an eye doctor. (J.A. 313, 1986.) His father took photographs of him after the second arrest which demonstrate that his eyes had swollen shut, and his face was puffy and crusted to his left ear. (J.A. 340, 341.)

Also included in the record are Vaughn's medical records from his treating physician, Dr. Warren. In records dated March 20, 1995, Warren noted that Vaughn had been sprayed in the face with pepper mace five days ago, and had been in the emergency [**7] room a couple of times. (J.A. 330.) He further explained that Vaughn:

> has developed a dermatitis with possible secondary infection. The present appearance is that of a severe contact dermatitis involving the left ear, an area underneath the left side burn, the left pre-auricular area. He has a small amount of crusting underneath his naries and a small amount of crusting underneath the midline of the lower lip. He has some blurring in the left eye. He was seen by Dr. Schenk and he told him that he had a coronary abrasion. He complains of some decreased hearing in the left ear. . . . Impression is: Skin injury secondary to the pepper mace.

(*Id.*) Vaughn saw Dr. Warren again on March 24 and 27 for follow-up treatment. (J.A. 331-32.)

**B. April 1, 1995 (No. 99-6673)**

Vaughn was arrested for public intoxication and resisting arrest on April 1, 1995. Lebanon Police Officer Jack Bare testified that he responded to a "flagdown" by a man who said that people were drinking in his apartment and would not leave. Bare went to the apartment and found Vaughn and others drinking inside. (J.A. 1824.) Bare subsequently left the scene to report to a nearby car collision. [**8] (J.A. 1825.) Officer Bonnie Wells, on her way to the scene of the car wreck, was then flagged down by the same gentleman and asked if she could help remove Vaughn from his residence. (J.A. 2171.) Wells testified that she entered the residence and found Vaughn sitting on the floor and yelling. (*Id.*) Wells was joined by Officer William Glover in the apartment, and the two officers attempted to convince Vaughn to leave the apartment. (J.A. 2172.) When they were unsuccessful, Wells decided that they should carry him downstairs. (*Id.*) According to Wells, when the officers picked up Vaughn, he began kicking "and screaming I'll kick you in the face, you bitch." (*Id.*) Bare, still watching the apartment from the scene of the car wreck, stated that he observed Vaughn attempting to kick Wells as she carried him down the stairs. (J.A. 1820.)

Vaughn was transported to the Wilson County jail for booking. Wells testified that Bare himself carried Vaughn into the jail, where he fell upon the floor and began screaming at the officers. (J.A. 2180-81.) Vaughn allegedly became increasingly violent in the jail, taking a swing at one of the officers. (J.A. 1829.) At that point, Bare observed [**9] Mary Goodman, a Wilson County [*258] jailer working at the booking desk, spray Vaughn with Freeze +P. n3 (*Id.*) Some of the Freeze +P landed on Bare's face, as he was standing directly behind Vaughn at that time. Wells testified that she never sprayed Vaughn with Freeze +P on April 1, 1995. (J.A. 2177.)

> n3 Goodman is not a defendant in any of the cases brought by plaintiff. In her affidavit filed in support of defendants' motions for summary judgment, she stated that "In order to protect myself from being hit by Mr. Vaughn, I stepped back from the booking counter, grabbed a canister of Freeze +P that was on the booking desk, and sprayed Mr. Vaughn." (J.A. 944.)

Presley testified that he arrived at the jail as Vaughn was being brought in for booking, and held the door open for the officers to bring in Vaughn. (J.A. 933.) He observed Vaughn being violent, at one point attempting to hit Goodman, provoking her to spray Vaughn with Freeze +P. (J.A. 934.) Although he asserted that he had no contact with Vaughn during his [**10] booking, he did monitor Vaughn in the drunk tank that night. (*Id.*) Presley stated that he had to restrain Vaughn during the night because he was being violent, but that he did not use Freeze +P. (*Id.*)

Vaughn again provided a differing account of the arrest. He stated that he was drinking in a friend's apartment when Bare arrived and told Vaughn he was drunk. (J.A. 1994.) Bare then began to handcuff Vaughn. Vaughn jerked away because he knew he was about to

get sprayed, at which time Wells came around behind Bare and sprayed Vaughn with Freeze +P across his whole face, in his eyes, and on his right forearm. (J.A. 1994, 1997-98.) Vaughn asserted he did not resist arrest, but told the officers that he did not want to go to jail and asked them not to spray him. (J.A. 1995.) Vaughn denied attempting to hit or kick Wells. Vaughn alleged that while at the county jail, Presley sprayed him on three separate occasions. (J.A. 2077, 2098, 2235-36.) Vaughn's brother, Lewis Vaughn, was also present at the Wilson County jail on an unrelated charge when Vaughn arrived, and testified that he saw Vaughn sprayed by Bare and Presley. (J.A. 2149.)

The next morning Vaughn's father took more pictures [**11] of Vaughn's face. (J.A. 343-46, 2003.) He then took Vaughn to the hospital. (J.A. 2003.) His admission form states that he complained of facial pain and burning, and that his eyes were swollen shut and his vision blurred. (*Id.*) Vaughn was transferred to the burn unit at Vanderbilt Hospital, where he was treated for chemical burns. (J.A. 317, 320-21.) Vaughn followed up with Dr. Warren on April 3, 1995, who noted that Vaughn had "swelling of both eyes . . . and second degree burns over the entire left side of the face." (J.A. 332.) Warren prescribed steroids and antibiotics. (*Id.*) Vaughn saw Warren again on April 3, April 7, April 11 and April 21. (J.A. 333-34.)

On April 5, Warren telephoned the Wilson County Sheriff's department to speak to someone about Vaughn. His office notes record the following conversation:

> Conversation with the sheriff's department regarding Daryl Vaughn. I spoke with a Mr. Davis, I believe was his name, and he said that he'd been there 20 years and new [sic] Mr. Daryl Vaughn very well. I explained to him the fact that he appears to be having allergic reactions to the pepper mace, and that this was more of a reaction than one usually sees [**12] with that. We both realize that we did not witness him being sprayed with pepper mace, and that we did not witness Mr. Vaughn's behavior after his arrest. I have just told him that if truly he was sprayed [*259] with this pepper mace, that it is having a terrible reaction and I have asked them if they would please discipline Mr. Vaughn in some other way.

(J.A. 333.)

Wells testified that sometime soon after April 1, 1995, she saw a bulletin posted at the Wilson County Sheriff's Department indicating that Vaughn suffered an adverse reaction to Freeze +P. (J.A. 2184.) Wells was told by one of her fellow officers that Vaughn had been taken to the hospital for treatment following the April 1 arrest. (J.A. 2185-86.) After Wells saw the bulletin, she asked around to make sure officers were not supposed to spray Vaughn "because sometimes the jail likes to joke around." (J.A. 2189-90.) She testified that she received confirmation from another officer that they were no longer to use Freeze +P on Vaughn. (J.A. 2190-91.)

### C. September 15, 1995 (No. 99-6676)

Vaughn was arrested on September 15, 1995, by Sergeant K.D. Smith. Vaughn testified that Smith and another officer (not a [**13] defendant here) knocked on the door of his hotel room and "pushed in" on him as he was making a sandwich. (J.A. 2020.) Vaughn recounted that Smith told him there had been reports of an altercation, and then pushed Vaughn onto the bed and sprayed him with pepper spray. (*Id.*) Vaughn stated that he told Smith that he could not take the spray and begged him to stop. (J.A. 2021.)

Smith was not deposed, but did submit a sworn affidavit. He averred that when he arrived at the hotel room, Vaughn was "belligerent and intoxicated." (J.A. 2210.) Smith "attempted to talk to Daryl Vaughn in order to calm him down. However he refused to do so and got very belligerent toward myself and the other officer." (*Id.*) At that point, he allegedly "had no reasonable alternative but to spray Mr. Vaughn with Freeze +P in order to effectuate the arrest." (*Id.*)

Vaughn saw Dr. Warren on September 19, 1995. The physician's notes report that Vaughn had "some crusting along the eyebrows, around the eyes and over the nose but this doesn't appear to be as bad as the last episode." (J.A. 335.)

### D. November 10, 1995 (No. 99-6672)

Vaughn was arrested again on November 10, 1995, by Bowen and [**14] Smith. (J.A. 1860.) Bowen testified that he and Smith responded to a fight call at a motel where they found Vaughn's brother, Jerry Vaughn, unconscious and bleeding on the floor. (*Id.*) Plaintiff and an unidentified woman were also present. (*Id.*) Vaughn allegedly told him that he and his brother had been in an argument over the woman and that he had "beat the hell out of" his brother. (*Id.*) Bowen placed Vaughn under arrest for aggravated assault. (J.A. 1861.) Vaughn, however, refused to put on his shoes and accompany the officers to jail, instead sitting on the floor with his fists balled and his teeth gritted, cursing Bowen and Smith. (J.A. 1862.) Bowen testified that "at that time I sprayed Mr. Vaughn with a blast of freeze cause I told him at least three times he was under arrest." (*Id.*) Bowen

explained that after he sprayed Vaughn, Vaughn lunged toward his gun and took a swing at the officer. (J.A. 1865.) Bowen and Smith then got Vaughn face-down on a bed, handcuffed him, and carried him to the squad car. (J.A. 1864.) Smith's affidavit supports Bowen's recounting of these events. (J.A. 730-31.)

Vaughn's deposition testimony differed. He alleged he was drinking with [**15] his brother at his brother's apartment when he got into an argument with the unidentified woman. (J.A. 2050.) Vaughn was admittedly drunk. (J.A. 2054.) Vaughn testified [*260] that he and the woman went into the bathroom to continue their argument. (J.A. 2050.) While they were in the bathroom, they heard a loud thump from the living room, and came out to find his brother lying on the floor. (*Id.*) His brother allegedly told him that he was about to pass out and had caught his foot on the rug and fallen into the coffee table. (*Id.*) Plaintiff denied assaulting his brother in any way. (J.A. 2051.) Vaughn stated that when the officers arrived, he was doctoring his brother's wounds. He was then grabbed from behind, pulled onto his back, sprayed, and taken to jail. (J.A. 2053.)

Vaughn was treated at the University Medical Center on November 10, 1995, for chemical burns and blisters on his cheeks and around his eyes. (J.A. 326-29.) Photographs taken by his father document Vaughn's appearance after the November 10 spraying. (J.A. 352.)

### E. February 6, 1996 (No. 99-6675)

Vaughn's last arrest at issue here occurred on February 6, 1996. Bare testified that he received a call of [**16] a drunk and disorderly individual at a local convenience store. (J.A. 1842.) Upon arriving at the scene, he found another officer (not a defendant here) taking Vaughn to the ground and attempting to handcuff him. (J.A. 1843.) As he reached the two, Vaughn was already handcuffed. Bare testified that Vaughn was verbally threatening the other officer. Bare eventually placed Vaughn into his squad car and transported him to the Wilson County jail, where he intended to charge Vaughn with public drunkenness and resisting arrest. (J.A. 1843-44.) Bare noted that he "specifically remembered that the Freeze had been applied" on Vaughn, but by the other officer, not Bare. (J.A. 1846.)

Despite Bare's attempt to charge Vaughn, however no arrest warrant was filed that night. (J.A. 1844.) When he arrived at the jail, one of the jailers, Ray Howell, showed him a memorandum signed by Wilson County Sheriff Terry Ashe to all correctional officers which, Bare recalled, stated "that it is a proven fact that Daryl Vaughn is allergic to the Freeze Plus P or pepper spray and then there was something, please attempt from or attempt to refrain from using it or try not to use it when dealing with him, if possible. [**17] " (J.A. 1838.) Howell told Bare that he had to take Vaughn to the emergency room. (J.A. 1839.) Bare refused, instead asserting that the memorandum "stated nothing about medical attention" and "was not addressed to [him] as a city police officer." (*Id.*) When pressed on this issue by plaintiff's counsel, Bare denied any duty to take Vaughn to the hospital:

> Q: Did you have any reason to doubt the correctness of the information contained in the memo?
>
> A: There was no factual basis whatsoever stated in the memo about his being allergic to it. Basically, it appeared to me that he was allergic to it because the Sheriff said he was.
>
> Q: So you just didn't believe the memo, is that correct?
>
> A: The memo did not apply to me as it was addressed to correctional officers. It stated that it was a proven fact that he was allergic to the Freeze Plus P pepper spray, please attempt to refrain from using it when dealing with him.
>
> * * *
>
> A: I determined from the intended symptoms or results of administering the spray, along with the fact that he did not request to go to the hospital and plainly, plainly was not suffering from any adverse reaction [*261] at the time I took him into [**18] the booking room, that he did not need to go to the hospital.

(J.A. 1839-40, 1842.) Bare concluded that the reason a warrant was not issued for Vaughn that night was his refusal to take Vaughn to the emergency room. n4

> n4 A true bill was issued in the spring of 1997 by a grand jury in connection with this arrest. (J.A. 311, 1847-48.)

During his deposition, Vaughn recalled that he was on his way to the jail to begin serving time for disorderly conduct when he stopped at the convenience store to buy some liquor. (J.A. 2037.) As he was leaving the store, Bare pulled up and told him he smelled like liquor and that he was going to arrest Vaughn. (J.A. 2039.) Bare allegedly pushed him in the chest, calling him a drunk.

(J.A. 2039-40.) As Vaughn stumbled backward, Bare allegedly threw him on the ground face-first, breaking his nose and cutting his forehead. (J.A. 2040.) Vaughn testified that while on the ground, Bare sprayed him with Freeze +P. (J.A. 2041.) After being taken to the jail, Vaughn was released [**19] because, in his words, he "wasn't drunk" and no warrant could be issued. (J.A. 2044.)

Vaughn saw Dr. Warren on February 7, 1996. Warren's office records state that:

> Vaughn was sprayed in the face with pepper mace again. He said that he had drunk a bottle of beer, 16 ounces. Several hours later, he walked over to the store, and slipped on the icy pavement. The city police and he then interacted and he was sprayed in the face with the pepper mace. He is here today with inflammatory changes with blistering around the eyes, and across the nose down to the upper lips. His mouth and ears are not involved this time. There is no obvious gross infection.

(J.A. 335.) Vaughn saw Warren again on February 14, 1996 for treatment of these injuries. Warren's notes for this visit state "He must have broken his nose at this last episode, and Dr. O'Quinn has suggested surgery for his nose." (*Id.*)

**F. Procedural History**

Defendants filed motions for summary judgment on all of plaintiff's claims. Magistrate Judge Haynes issued five separate reports recommending that defendants' motions be granted. He also recommended striking the affidavits of plaintiff's proposed experts [**20] as well as denying plaintiff's motion to file an additional expert affidavit. Overruling Vaughn's objections, the district court granted the motions to strike and for summary judgment.

Vaughn now appeals the district court's orders.

**II. ANALYSIS**

**A. The District Court Did Not Abuse Its Discretion in Excluding Expert Affidavits**

Vaughn filed the present actions in September 1996. The cases were consolidated for discovery on October 1, 1996. (J.A. 60-63.) In May 1998, the district court entered a case management order requiring: (1) all fact discovery be completed by July 31, 1998; (2) Vaughn to serve his Rule 26 expert reports by August 3, 1998; and (3) Vaughn to make his experts available for deposition no later than September 7, 1998. (J.A. 110.)

Vaughn presented for the first time in these proceedings the affidavits of J. Buford Tune n5 and Robert Thrasher n6 in support [*262] of his opposition to defendants' motions for summary judgment. Vaughn's briefs and attachments in opposition were filed on or about October 20 and November 12, 1998, n7 several months after the date set for disclosure of expert witnesses. Vaughn also filed a motion on January 27, 1999, to permit [**21] the filing of the affidavit of Dr. Woodhall Stopford, an expert on the effects of chemical agents, including oleoresin capsicum, which is an ingredient of Freeze +P. (J.A. 571-72.) Defendants objected to the admission of all three affidavits, contending that they were not disclosed in accordance with the schedule set by the court, and that the purported experts were not qualified to testify on the topics for which they were proffered.

> n5 Tune is the owner and chief instructor for the Academy of Personal Protection & Security, which "provides a variety of self-defense training including the use of aerosol defensive sprays for citizens, security officers and law enforcement." (J.A. 428.)
>
> n6 Thrasher is the president of Wolf Pack Arms & Police Supplies and is an instructor on the use of chemical weapons by law enforcement agents. (J.A. 358.)
>
> n7 On October 20, 1998, plaintiff filed a brief in opposition, along with the affidavits of Tune and Thrasher, in the case involving defendants Presley and Wilson County. On November 12, 1998, he filed subsequent briefs in opposition in the remaining four cases. (Two days earlier, he asked the court to take notice in the latter four cases of the previously-filed expert reports.) Given the district court's earlier order that documents be filed separately in each case, it is unclear whether the Lebanon defendants received actual notice of the proposed expert reports on the earlier date.

[**22]

In recommending that the expert affidavits be stricken, the magistrate judge first cited Fed. R. Civ. P. 37(c)(1) which provides for the exclusion of certain evidence not disclosed in a timely manner. The magistrate judge noted that Vaughn's failure to disclose these experts served to prejudice the defendants by not allowing them an opportunity to prepare a response. The

magistrate judge further found that the experts did not pass the threshold requirement for qualification set out by Fed. R. Evid. 702.

This Court reviews a district court's decision to sanction a party for discovery violations for an abuse of discretion. *King v. Ford Motor Co.*, 209 F.3d 886, 900 (6th Cir.), *cert. denied*, 531 U.S. 960, 121 S. Ct. 386, 148 L. Ed. 2d 298 (2000); *Pedigo v. UNUM Life Ins. Co. of Am.*, 145 F.3d 804, 807 (6th Cir. 1998); *Beil v. Lakewood Eng'g & Mfg. Co.*, 15 F.3d 546, 551 (6th Cir. 1994). An abuse of discretion occurs when "(1) the district court's decision is based on an erroneous conclusion of law, (2) the district court's findings are clearly erroneous, or (3) the district court's decision is clearly unreasonable, arbitrary [**23] or fanciful." *Beil, 15 F.3d at 551.*

Rule 26(a)(2)(C) requires parties to disclose written reports of their proposed expert witnesses "at the times and in the sequence directed by the court." Parties that do not comply with the disclosure requirement face sanctions under Rule 37(c)(1), which reads in relevant part: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), . . ., is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed." n8 Examples when it may be appropriate to permit the [*263] use of such evidence include: "the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures." Fed. R. Civ. P. 37 advisory committee's note to the 1993 amendments.

n8 Rule 37(c)(1) was modified in 2000. The previous version of the rule in effect at the time of the magistrate judge's recommendations and the district court's decisions reads: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) *[] shall not*, unless such failure is harmless, *be permitted* use as evidence . . . on a motion any witness or information not so disclosed." (emphasis added). As is clear, however, the changes have no significant impact on our analysis in this case.

[**24]

Courts have found that, absent a showing of "substantial justification" or "harmless" violation, Rule 37(c)(1) requires a district court to impose a sanction for violation of the disclosure requirement. *See, e.g., Bowe v. Consolidated Rail Corp.*, 2000 U.S. App. LEXIS 24866, No. 99-4091, 2000 WL 1434584, at *2 (6th Cir. Sept. 19, 2000) (unpublished) ("It is well-established by this Court and others that Rule 37(c)(1) mandates that a trial court shall sanction a party for discovery violations in connection with Rule 26 unless the violations were harmless or were substantially justified.") (citing *Salgado v. General Motors Corp.*, 150 F.3d 735, 742 & n.6 (7th Cir. 1998) (holding that Rule 37(c)(1) puts teeth into Rule 26 and that "the district court acted well within its discretion when it decided to impose the sanction of precluding the witnesses from testifying" since "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless"); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996) (same); *Ames v. Van Dyne*, 1996 U.S. App. LEXIS 29700, No. 95-3376, 1996 WL 662899, at [**25] *4 (6th Cir. Nov. 13, 1996) (unpublished) ("Rule 37 is written in mandatory terms and 'is designed to provide a strong inducement for disclosure of Rule 26(a) material.'") (quoting *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 156 (3d Cir. 1995))).

It is clear from the record that Vaughn violated Rule 26 by failing to disclose his proposed expert affidavits in a timely manner. He argues on appeal that the delay was harmless because fact discovery had not been completed and the disclosure of expert witnesses was not anticipated to occur until after completion of fact discovery. Plaintiff further asserts that "the only prejudice the defendants would face would be the necessity of conducting additional fact and expert discover' which they had anticipated doing in any event since fact discovery had not even been completed at the time their summary judgment motions were filed." Appellant's Final Brief at 63.

The Case Management Order No. 2 belies plaintiff's argument that fact discovery had not been completed at the time defendants' dispositive motions were filed. A prior case management order had set out an initial phase of discovery to be completed by March 30, 1997. The [**26] magistrate judge's second case management order governed "all remaining discovery and dispositive motions." (J.A. 110.) As noted above, all fact and party discovery depositions were to be completed by July 31, 1998. While it is correct that defendants Presley and Wilson City filed a motion for summary judgment on June 30, 1998, before discovery was closed, the remaining defendants filed their separate motions for summary judgment on October 20, 1998, well after the close of fact and expert discovery. Thus, it is does not appear that further discovery could have been taken by defendants of plaintiff's proposed experts without modification of the discovery order. Under such

circumstances, the defendants were prejudiced in their preparation of dispositive motions and effective replies. *Hermeling v. Montgomery Ward & Co., Inc., 851 F. Supp. 1369, 1376 (D. Minn. 1994)* ("Furthermore, Hermeling's counsel's untimely disclosure has unfairly prejudiced Montgomery Ward in its preparation for this motion [for summary judgment] by effectively precluding any type of [*264] formal rebuttal.") (citing *Tallarico v. Trans World Airlines, Inc., 881 F.2d 566, 572 (8th Cir. 1989))*; [**27] *see also Taylor v. Medtronics, Inc., 861 F.2d 980, 985-87 (6th Cir. 1988)* (analyzing an earlier version of Rule 37).

Furthermore, the advisory committee's note to Rule 37(c) "strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vance v. United States, 1999 U.S. App. LEXIS 14943, No. 98-5488, 1999 WL 455435, at *5 (6th Cir. June 25, 1999) (unpublished)*. Here there was neither. Defendants submitted expert interrogatories to plaintiff in January 1997. Vaughn never provided any expert reports or other information regarding experts at any time prior to the response. Plaintiff was aware of the discovery schedule by at least June 17, 1998, and deliberately disobeyed the disclosure deadline. Furthermore, a review of the record does not show that the delay was "substantially justified" under the circumstances.

Vaughn's real complaint should be with the district court's refusal to modify the scheduling order, not its decision to strike the affidavits. *See id.* (citing *Salgado, 150 F.3d at 742 n.6)*. He maintains that he delayed disclosing his expert affidavits because [**28] the parties were waiting for the district court's decision on plaintiff's earlier motion to amend the scheduling order, or, alternatively, for an extension of time. Although the motion was filed on July 21, 1998, the district court did not issue an order until October 7, 1998. The court ordered that all dispositive motions be filed by October 20, 1998, and that any responses thereto be filed in accordance with the Federal Rules of Civil Procedure. (J.A. 119.) It denied Vaughn's motion as moot.

Vaughn correctly points out that his motion was not entirely made moot by the district court's order. Specifically, the court failed to address his request to modify the discovery deadlines. Vaughn argues that shortly after the district court made its ruling, he disclosed the expert affidavits in a good faith attempt to comply with the disclosure requirements.

His position would be more sympathetic if it appeared he had used due diligence in complying with the court's deadlines that were in effect at the time. Yet, the affidavits of Thrasher and Tune were not taken until September 11, 1998, more than a month past the deadline, and were not disclosed to defendants until October 20 and November 12, 1998. The [**29] affidavit of Stopford was not taken until January 27, 1999, well past even plaintiff's own proposed deadlines for discovery and dispositive motions. As evidenced by the dates of the affidavits, moreover, it is clear that Vaughn continued to *take* expert discovery after the original deadline had passed; he simply decided not to *disclose* his expert affidavits or make the experts available for deposition during this so-called waiting period. His failure to use due diligence in meeting the deadlines is fatal to his position. n9

------

n9 As asserted by defendants before the district court, plaintiff arguably failed to request an extension for Rule 26 expert reports and depositions in his motion to amend the scheduling order or to extend discovery. In the body of his motion he does note that he would need to depose two treating physicians and two "designated representatives" from competitors of DP Packaging, Inc., the manufacturer of Freeze +P (presumably these were Tune and Thrasher). Yet, in his proposed extended deadlines, Vaughn failed to ask for an extension of the time to serve Rule 26 expert reports and make his experts available for depositions. (J.A. 114.) Defendants have not, however, argued this point on appeal.

------

[**30]

Accordingly, we find that the district court did not abuse its discretion under [*265] Rule 37(c). Such a finding moots any analysis of whether the district court's exclusion of the experts satisfied the gatekeeper provisions of *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*.

A. Summary Judgment

Vaughn argues that the district court erred when it granted defendants' motions for summary judgment. We review the district court's grant of summary judgment *de novo. Plant v. Morton Int'l, Inc., 212 F.3d 929, 933 (6th Cir. 2000); Grand Traverse Band of Ottawa & Chippewa Indians v. Michigan Dep't of Natural Resources, 141 F.3d 635, 638 (6th Cir.), cert. denied, 525 U.S. 1040, 142 L. Ed. 2d 533, 119 S. Ct. 590 (1998)*.

Summary judgment may be granted only when there is no genuine issue of material fact for a jury to consider. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Plant, 212 F.3d at 934*. We must consider "the pleadings, depositions, answers to interrogatories, [**31] and

admissions on file, together with the affidavits, if any," in the light most favorable to the opposing party, here plaintiff. *Celotex, 477 U.S. at 323.* While "credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986),* the non-movant may not rely solely on his pleadings, but must demonstrate the existence of a genuine issue of material fact by pointing to "specific facts" that create such an issue, *Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).*

**1. Excessive Force**

"To successfully state a claim under *42 U.S.C. § 1983,* a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati, 953 F.2d 1036, 1042 (6th Cir. 1992).* Vaughn asserts in each of his cases that he was the victim of excessive force used to effectuate [**32] his arrest in violation of his rights under the Fourth Amendment, which provides in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. The right of a pre-trial detainee to be free from the use of excessive force under the Fourth Amendment is firmly established in our case law. *Graham v. Connor, 490 U.S. 386, 393, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)* ("Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, . . . ."). To overcome the defendants' motions for summary judgment, Vaughn must present evidence sufficient to create a genuine issue of material fact as to whether his rights were, in fact, violated by the defendants' actions. *Russo, 953 F.2d at 1043.*

All claims of excessive force are to be evaluated under the Fourth Amendment's "objective reasonableness" standard. *Graham, 490 U.S. at 395.* Under this standard, a court must evaluate whether [**33] the totality of the circumstances justifies a particular sort of seizure. The propriety of the officer's actions must be considered "without regard to [the officer's] underlying intent or motivation." *Id. at 397.* Further, "the 'reasonableness' must be judged [*266] from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Id. at 396.* Echoing *Graham,* this Court has found that application of the objective reasonableness standard:

requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Pleasant v. Zamieski, 895 F.2d 272, 276 (6th Cir.)* (quoting *Graham, 490 U.S. at 396), cert. denied, 498 U.S. 851, 112 L. Ed. 2d 110, 111 S. Ct. 144 (1990).* Accordingly, the determination of objective reasonableness is particularly fact-based, and, when accounts differ, requires credibility determinations among witnesses [**34] to assess the propriety of an officer's actions. Such determinations are matters for the jury, and not the court. *Headwaters Forest Defense v. County of Humboldt, 240 F.3d 1185, 1198 (9th Cir.), petition for cert. filed, 69 U.S.L.W. 3715 (U.S. Apr. 30, 2001) (No. 00-1649).*

Vaughn claims that the use of pepper spray against him by the officers of the Lebanon Police Department and Wilson County Sheriff's Department was unreasonable in light of his conduct at the time he was arrested. We have previously found that the use of a chemical weapon, if unreasonable in manner, may constitute excessive force. *Adams v. Metiva, 31 F.3d 375, 384 (6th Cir. 1994).* The use of a chemical weapon such as pepper spray is not per se unreasonable. As established in *Adams,* the analysis for use of a chemical weapon as force is essentially the same as that for the use of more traditional forms of physical control, turning upon the totality of the circumstances, including the arrestee's conduct and the officer's reasonable perception of the scenario. *Id. at 386.*

In each of the reports and recommendations, Magistrate Judge Haynes briefly [**35] recounted the parties's respective accounts of the arrests. He noted in each that the officers were responding to calls of a drunk and disorderly person. Vaughn admitted during his deposition that he had consumed alcohol prior to his contact with officers. In other respects, however, the magistrate judge found Vaughn's deposition testimony "internally inconsistent." He concluded that Vaughn had failed to present sufficient proofs to create a genuine issue of material fact that defendants acted unreasonably in violation of the Fourth Amendment. The district court accepted and adopted the magistrate judge's recommendations.

Upon thorough review of the record, we find that the district court erred in dismissing several of Vaughn's claims against the individual officers.

#### a. March 14 and 15, 1995

There exist significant differences between the versions of events provided by Vaughn and those by the individual officers. Bowen, for example, testified that he did not spray Vaughn at any time during the two March 1995 arrests. Moreover, he stated that Vaughn did not behave in a manner that would warrant the use of pepper spray. Vaughn, however, asserted that he was sprayed with [**36] pepper spray by Bowen on both encounters. In support, Vaughn provided photographs of his injuries and medical records of treatment sought for those injuries.

The magistrate judge's report and recommendation does not address the medical evidence submitted by Vaughn or the disparity between the two eye witnesses to these arrests. In doing such, the magistrate judge failed "to view the evidence in [*267] the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences." *Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 583 (6th Cir. 1994)*. While the magistrate judge concluded that much of Vaughn's deposition testimony was not credible, such determinations are properly left to the jury except "when the record taken as a whole could not lead a rational trier of fact to find" for the plaintiff. *Matsushita Elec., 475 U.S. at 587* (finding, for example, that no genuine issue of material fact would exist for trial where the "factual context renders [a party's] claim implausible," unless the party presented "more persuasive evidence to support [its] claim than would otherwise be necessary" under [**37] Rule 56).

Given Bowen's statement that there was no cause to spray Vaughn, any application of pepper spray during those two arrests may well have constituted excessive force under the Fourth Amendment. *See Adams, 31 F.3d at 385-86*. While Bowen denied spraying him, Vaughn has presented testimonial evidence as well as medical records suggesting that he was sprayed with pepper spray during at least one of the two arrests in March 1995. This is sufficient to create a genuine issue of material fact on whether Vaughn's Fourth Amendment rights were violated during these arrests. Accordingly, we reverse the district court's grant of summary judgment to Bowen on this claim.

#### b. April 1, 1995

There also exists a genuine issue of material fact whether Wells used excessive force against Vaughn during his arrest on April 1, 1995. It is undisputed that he was sprayed with Freeze +P that evening. Several defendant officers assert that Vaughn was sprayed not during his arrest, but at the jail during booking by non-defendant Goodman. Vaughn, however, testified that Wells sprayed him during the actual arrest.

The magistrate judge correctly pointed out that Vaughn's testimony [**38] regarding the April arrest is confused at various points. Yet, the wholesale rejection of the testimony is unwarranted here. It is understandable that when providing deposition testimony as to six different arrests, all of which admittedly involved alcohol, an individual may get confused at times as to the events of each arrest. If such confusion permeates throughout all of the testimony, never being clarified, then rejection of the entire testimony may be proper.

A review of his deposition testimony, however, shows that Vaughn provided a sufficiently clear description of the events of the April 1, 1995 arrest to create a genuine issue of material fact. For instance, at one point defense counsel specifically asked Vaughn to identify the officer or officers that sprayed him during the arrest:

> Q: And what happened?
>
> A: He came toward me and he said, You're drunk again, aren't you? I said, I've been drinking. And he said, Well, turn around and put your hands behind your back. And he started to put the handcuffs on me. And I did jerk one hand away from him because I knew what he was going to do. About that time, I put my arms up like that (indicating), and he started to reach [**39] around and get my other arm. She come around him, beside him, and she started spraying me.
>
> Q: Who is she?
>
> A: Ms. Bonnie Wells.

(J.A. 1994.) Later in the deposition, Vaughn again identified Wells as the officer [*268] that sprayed him during the April arrest, and provided a description of the officer to counsel. (J.A. 2075.)

If Vaughn's testimony is credited, Wells may have in fact used excessive force against him during the arrest. While he admitted to "jerking one hand away" as one of the officers attempted to handcuff him, there is a question of fact whether he posed an immediate threat to the safety of the officers or others, or whether the officers interpreted his movement as an attempt to resist arrest. n10 Accordingly, the district court's grant of summary judgment to defendant Wells related to the April 1, 1995 is reversed.

n10 It appears from the record that Vaughn did plead guilty to resisting arrest in connection with the April 1, 1995 arrest. The record is completely void, however, of the predicate facts of the charge or those to which he admitted. While his conviction may be relevant to any future proceedings, defendants did not argue below, nor on appeal, that his criminal conviction bars his present civil action. *See, e.g., Donovan v. Thames, 105 F.3d 291 (6th Cir. 1997)* (arrestee's state court conviction for resisting arrest did not bar his excessive force civil rights claim); *Isibor v. City of Franklin, 1998 U.S. App. LEXIS 10766, No. 97-5729, 1998 WL 344078 (6th Cir. May 26, 1998)* (unpublished) (arrestee was collaterally estopped from bringing excessive force claim based on his state court conviction for resisting arrest).

[**40]

Summary judgment is affirmed, however, as to Bare and Glover. Plaintiff plainly concedes that Bare did not spray him during the April 1, 1995 arrest or booking. (J.A. 1994.) There is no credible evidence that Glover had any involvement in claims of excessive force. (*Id.*, J.A. 2078.)

Summary judgment was properly granted to Presley as well. In addition to the arrest that night, Vaughn claimed that he was sprayed several times during booking. The description of events proffered in support of the claim is, however, quite convoluted and, at points, directly contradictory. For example, throughout a portion of his testimony, he specifically denied having any direct knowledge that Presley was involved in the spraying that night. (J.A. 2227, 2234-35.) At several other times, however, Vaughn claimed he "saw" Presley spray him. (J.A. 2098.)

Moreover, at one point Vaughn testified that Presley sprayed him "twice" at the jail (J.A. 2098), but then he went on to describe three separate incidences: (1) Presley sprayed him by the back door before Vaughn had entered the booking room (*id.*), and kept spraying him "all the way to the booking desk" (J.A. 2236); (2) Presley sprayed him as other [**41] officers were pulling Vaughn off the ground in the booking room (J.A. 2077); and (3) Presley sprayed him again through a hole in the door of the drunk-tank door (J.A. 2235). Plaintiff's brother, Lewis Vaughn, on the other hand, asserted that Bare, not Presley, sprayed plaintiff as the officers were pulling him off the ground. (J.A. 2149.) He alleged that Presley sprayed him not once, but twice at the drunk-tank door, once on the outside of the door and once through a hole in the door moments after Vaughn entered the tank. (J.A. 2153-54.) He made no mention of Presley spraying plaintiff "all the way to the booking desk." In fact, he testified that Presley was behind the booking desk when plaintiff was brought in to the jail. (J.A. 2050-51.) Other inconsistencies permeate throughout plaintiff's and Lewis Vaughn's testimony of the night's events at the jail.

Taken as a whole, no rational trier of fact could find for plaintiff against Presley on these differing and contradictory allegations. *See Matsushita, 475 U.S. at 586-87; Rembert v. Holland, 735 F. Supp. 733, 737 (W.D. Mich. 1990)*. Accordingly, [*269] summary judgment was properly granted to Presley. n11 [**42]

n11 Presley was the only defendant that raised a claim of qualified immunity in a motion for summary judgment. Given our affirmance of the district court on the excessive force claim against Presley, we need not go through the separate qualified immunity analysis set forth by the Supreme Court in *Saucier v. Katz, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001)*.

**c. September 15, 1995**

Neither side disputes that Vaughn was sprayed by Smith on September 15, 1995. The question thus becomes the reasonableness of the officer's actions in spraying Vaughn. If Smith's version is credited--i.e., Vaughn actively resisted arrest--his spraying with Freeze +P may have been reasonable under the circumstances. If, on the other hand, Vaughn's version is credited in the light most favorable to him, the use of any force may have been excessive.

Defendants correctly point out that Vaughn was unsure during his deposition whether Smith or another officer actually sprayed him during the arrest. Again, however, [**43] the wholesale rejection of his testimony is not called for here. Vaughn did testify in response to a question regarding the identity of the spraying officer: "One of them is all I can say." (J.A. 2086.) Given Smith's own admission that he sprayed Vaughn, the critical issue focuses on the parties' conduct, not the identity of the officer. A review of Vaughn's testimony regarding the September 15, 1995 arrest shows that his version is not so implausible or inconsistent as to make it inherently untrustworthy.

Also, the purported memorandum in the Wilson County jail is at least some evidence that by September, Smith knew, or reasonably should have known, that Vaughn suffered an adverse reaction to pepper spray, and that its use against him should be avoided. Viewed in the light most favorable to plaintiff, this information, along with his testimony, creates a genuine issue of material

fact whether Smith's use of force was objectively reasonable. Summary judgment is therefore reversed on this claim.

### d. November 10, 1995

Similarly, summary judgment was improperly granted on plaintiff's excessive force claim against Bowen arising out of the November 10, 1995 arrest. Vaughn testified [**44] that he did not beat his brother, but rather was attempting to assist him when police arrived. He asserted that he did not resist arrest. (He was not charged with resisting arrest for this episode.) If plaintiff's testimony is credited, the use of pepper spray by Bowen does not appear to have been warranted.

In reviewing Bowen's testimony, his own version of the arrest creates some doubt as to whether the use of pepper spray was reasonable. In describing Vaughn's reaction to being placed under arrest, Bowen noted that after Vaughn refused to obey his commands and verbally threatened the officers, pepper spray was applied, and only then did Vaughn become physically aggressive towards the officers. This use of force for failure to obey a verbal command, even if accompanied by verbal threats, may have been unreasonable, especially in light of the possible knowledge of Vaughn's adverse reaction to the spray.

Vaughn did not, however, allege in his deposition that Smith sprayed him during the arrest. We can find no credible evidence in the record that Smith used excessive force against Vaughn during the November arrest. Accordingly, summary [*270] judgment was properly granted to Smith on this [**45] claim.

### e. February 6, 1996

Finally, material discrepancies exist in the record regarding the last arrest on February 6, 1996. Bare described his involvement as minimal, while Vaughn testified that Bare pushed him to the ground, breaking his nose and cutting his forehead, then sprayed him with Freeze +P. While he again admitted that he had been drinking before the arrest, Vaughn asserted that he did not resist arrest in any way that would have justified such use of force. Viewing the evidence in the light most favorable to Vaughn, Bare may well have acted with excessive force. Summary judgment is therefore reversed as to this claim.

### f. Supervisory Liability

In each of his five causes of action, Vaughn also claims that the Chiefs of Police for the City of Lebanon, defendants Charles Tomlinson and Billy Weeks, n12 violated his Fourth Amendment rights by failing to train and/or supervise officers, or had done so in a grossly negligent manner. To hold a supervisor liable for a subordinate's conduct, Vaughn must "prove that [the supervising officer] did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on." *Bass v. Robinson, 167 F.3d 1041, 1048 (6th Cir. 1999).* [**46] "Liability under this theory must be based upon more than a mere right to control employees and cannot be based upon simple negligence." *Id.*

> n12 Tomlinson was the Lebanon Chief of Police during Vaughn's first five arrests at issue here. Weeks was the Chief of Police during Vaughn's arrest in February 1996.

Vaughn has failed to present any evidence that Tomlinson or Weeks knew about the arrests, or otherwise encouraged or condoned any officer's conduct, whatever that may have been. Because the record is void of evidence upon which to make a claim against them, we find that summary judgment was properly granted.

### g. Municipality Liability

As for the City of Lebanon and Wilson County, Vaughn asserts that (1) there was no city or county policy on use of excessive force; (2) that the city and county did not train or supervise its police officers; and (3) that if the city and county did train or supervise, they did so in a "grossly negligent manner." (J.A. 626.) The magistrate judge correctly noted that [**47] evidence contained in the defendants' statement of undisputed facts and the plaintiff's response thereto establishes that the City of Lebanon and Wilson County do in fact have a set policy on use of excessive force. (J.A. 295, 1179-80.)

The magistrate judge also correctly established the standard under which claims of municipal liability for failure to train must be judged as that of deliberate indifference. As the Supreme Court held in *City of Canton v. Harris,*

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . [A] municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be

properly thought of as a city "policy or custom" that is actionable under § 1983.

[*271]

*489 U.S. 378, 388-89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)* (citations omitted).

The record contains [**48] extensive evidence regarding the training received by the individual officers of both the Lebanon Police Department and the Wilson County Sheriff's Department in the use of Freeze +P. Virtually every officer testified that he or she had been trained in the proper use of chemical weapons, and "diplomas" from such training course are included in the record for many of the defendants. (J.A. 936, 948, 949.) Vaughn failed to provide evidence sufficient to create a genuine issue of material fact that the training policies of the Lebanon Police and Wilson County Sheriff's Department could constitute "deliberate indifference." Accordingly, the district court did not err in granting summary judgment to the city and county on Vaughn's claims of excessive force. n13

n13 Similarly, summary judgment was also properly granted on plaintiff's claims against the individual defendants in their official capacities. "An official capacity suit is, in all respects other than name, to be treated as a suit against the [municipality]. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham, 473 U.S. 159, 166, 87 L. Ed. 2d 114, 105 S. Ct. 3099 (1985)* (emphasis in original) (citation omitted).

[**49]

**2. Deliberate Indifference to a Serious Medical Need**

**a. Failure to Raise Claim Before the District Court**

Defendants argue that Vaughn failed to raise any claim of deliberate indifference to his serious medical needs under either the Eighth or Fourteenth Amendments, and, therefore, the magistrate judge properly did not address them in any of his reports and recommendations. Vaughn does not argue here that such claims were expressly raised in his various complaints. Rather, he maintains that he effectively amended his complaints to add such claims in a case management order jointly submitted by the parties and entered by the district court in December 1996. Appellant's Final Opening Brief at 28.

In Case Management Conference Order No. 1, Vaughn set out the following against defendants Bowen, Wells, Bare, Glover, Smith, and Presley:

> Additionally, Plaintiff claims that the officers [and Deputy Sheriff Presley] failed to perform appropriate after care procedures following their use of Freeze +P and failed to provide him with medical attention for his injuries notwithstanding the obvious nature of same. As a result of the defendants' conduct, Plaintiff has incurred [**50] medical and hospital expenses and suffered physical damages, severe emotional distress, extreme pain even until the present, loss of enjoyment of life, loss of work and income, mental pain and suffering, and permanent impairment to his body and mental health.

(J.A. 66-67, 68.)

Vaughn made no attempt, however, to actually amend any of his complaints to add claims of deliberate indifference to a serious medical need. While neither the Joint Case Management Conference Statement nor the two subsequent Case Management orders set out deadlines for amendments of the pleadings, the allegation regarding "after care procedures" was submitted *after* each defendant had filed answers in the respective cases. Under Fed. R. Civ. P. 15(a), an amendment to add a claim after an answer has been filed must be made by leave of court or by written consent of the parties. It is apparent from the record that Vaughn never sought leave of the court or consent of defendants to [*272] add an additional claim. In contrast, defendants sought and received his consent to amend their answers. (J.A. 102-03.)

In support of his position that timely amendment was made, Vaughn argues that "[a] pretrial order, as [**51] authorized by Fed. R. Civ. Pro. 16, conclusively establishes the issues of fact and law in a case and declares that the issues so established should 'supplement pleadings and govern the course of the trial . . . .'" Appellant's Final Opening Brief at 29 (quoting *United States v. Hougham, 364 U.S. 310, 315-16, 5 L. Ed. 2d 8, 81 S. Ct. 13 (1960)*). However, the Supreme Court in *Hougham* was applying a previous version of Rule 16. That rule no longer contains language requiring a court to "make an order which recites . . . the amendments allowed to the pleadings." Rather, the current text of Rule 16(e) reads:

> **Pretrial Orders.** After any conference held pursuant to this rule, an order shall

be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice.

In this case, the Case Management orders do not explicitly permit Vaughn to amend his pleadings by adding the above language. While a party was permitted to amend its pleading via a pretrial conference order in *Hougham*, the [\*\*52] trial court in that case had expressly stated that "this order shall supplement the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice." There is no similar language in the Case Management orders here.

Courts have routinely refused to consider claims that were not properly raised in a complaint or amendment/supplement to the complaint. *See Young v. City of Mount Ranier*, 238 F.3d 567, 576-77 (4th Cir. 2001) (finding that factual and legal allegations in the complaint were insufficient to raise a claim of deliberate indifferent to a serious medical need arising from a pepper-spray incident); *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1138 (N.D. Ga. 1997) ("Plaintiff cannot change its theory of the case (in an effort to avoid summary judgment) *after* Defendant moves for summary judgment."). While defendants surely had notice of plaintiff's allegation regarding after-care procedures, Vaughn failed to properly raise the claims under the federal rules of procedure.

**b. Failure to Show a Genuine Issue of Material Fact**

Yet, even if we were to find that Vaughn properly raised a claim [\*\*53] of deliberate indifference below, remand would still be unnecessary because he has failed to present sufficient evidence to create a genuine issue of material fact. *See Nichols v. E.P. Perini*, 818 F.2d 554 (6th Cir. 1987). "Where prison [or jail] officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Horn v. Madison County Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir.), cert. denied, 513 U.S. 873, 130 L. Ed. 2d 130, 115 S. Ct. 199 (1994)). "Pretrial detainees are analogously protected from such mistreatment under the Due Process Clause of the Fourteenth Amendment." *Id.* (quoting *Horn*, 22 F.3d at 660).

As restated by this Court, the "deliberate indifference" standard has an objective and subjective component:

The objective component requires an inmate [or pretrial detainee] to show that the alleged deprivation is "sufficiently serious." As the Supreme Court explained [\*273] [\*\*54] in *Farmer*, "The inmate [or pretrial detainee] must show that he is incarcerated under conditions posing a substantial risk of serious harm." To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind."

*Id.* (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing and quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994))).

**i. Subjective Component**

In order to satisfy the subjective component of *Farmer*, Vaughn must present sufficient evidence that defendants knew or should have known that his symptoms and injuries were of such severity that he required immediate medical attention. Because defendants are laypersons, not physicians, we must determine if "a layperson would easily recognize the necessity for a doctor's attention" under the circumstances presented here. *Hill v. Dekalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994). Complicating the analysis is the fact that almost all persons against whom it is used suffer an adverse reaction to pepper spray. In fact, courts have found [\*\*55] that "pepper spray is *designed* to cause intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and a temporary paralysis of the larynx." *Headwaters Forest*, 240 F.3d at 1200 (emphasis in original). For most people, a thorough application of water can relieve the effects of the spray. *See id. at 1200-01*. It is apparently undisputed that Vaughn had access to a water faucet in the Wilson County jail cells. (J.A. 1891.)

The medical evidence offered by Vaughn certainly suggests that he suffered an allergic reaction to the spray which exacerbated its intended effects. There is nothing in the record to establish, however, that any of the defendants knew or should have known of his condition prior to Dr. Warren's call to the sheriff's department, and the subsequent memorandum posted to the department bulletin board. Without knowledge of his idiosyncratic reaction to the spray, "mere use" of the spray or failure to seek immediate medical treatment was not a Due Process violation. *See Young*, 238 F.3d at 576. Accordingly, none of Vaughn's first three encounters with [\*\*56] defendants can support a claim of deliberate indifference to his serious medical needs. The remaining question is

whether he presented sufficient evidence to create a genuine issue of material fact in any of the remaining causes of action.

Vaughn testified that he told defendants at various times that he "couldn't take" being sprayed; that he was having trouble breathing; and that his eyes were stinging. Yet, he allegedly told this to several defendants during or shortly after being sprayed. These are the intended effects of pepper spray, and it would not be unusual for an arrestee to complain about them immediately after application.

Vaughn also testified that after his first arrest in March 1995, he asked Presley "if they would take me to the hospital, that I felt like I might be blinded or something." (J.A. 1929.) Presley is not, however, a defendant in plaintiff's action arising from that arrest. Vaughn does not allege that he asked anyone else that night to take him to the hospital or to provide other medical care. Vaughn has pointed to no other testimony in the record, nor has the Court found any on its own review, where he recalled asking a defendant to take him to the hospital [**57] or to provide him with medical attention. This is consistent with Bare's testimony, recalling that during the February 1996 arrest, plaintiff "made no request to go to the hospital and did more, [*274] nothing more than verbally complain as to the effects of the spray, which fell well within what was intended." (J.A. 1840.)

While there is evidence that his adverse reaction to the spray was clearly visible, there is little to suggest that Vaughn was unable to request medical attention if he believed it was necessary. He admits he had been drinking for several hours before most of his encounters with defendants, and the pepper spray is specifically designed to disorient an arrestee. However, he testified that at least on one occasion during his prior three arrests he was able to request medical assistance a short time after being delivered to the jail.

Thus, it is not at all clear that even if defendants Smith and Bowen knew or reasonably should have known that plaintiff was allergic to the Freeze +P, and that they were to refrain, if possible, from using it against him, they should have also known that his condition required immediate medical attention regardless of whether he actually requested [**58] it. As to defendant Bare, he testified that he was told by personnel at the sheriff's department that Vaughn should be taken to the emergency room. However, this directive was apparently not in the memorandum provided to him by the department, and there is nothing in the record before us to suggest that Vaughn actually asked for medical attention. In fact, he was released from custody shortly after being brought to the jail, yet the record shows he did not seek medical treatment until a day or two later. (J.A. 338, 976.)

### ii. Objective Component

To satisfy the second component, Vaughn must present evidence that he was detained "under conditions posing a substantial risk of serious harm." *Farmer, 511 U.S. at 834.* It is undisputed that Vaughn sought and received medical treatment at some point after five of the six alleged encounters. Thus, this is not a case in which a pretrial detainee was denied medical attention for a significant amount of time because of defendants' actions or inactions. Instead, we must look to whether any *delay* in plaintiff's treatment caused by defendants rises to the level of a Due Process violation.

In examining whether a claimed [**59] injury is "sufficiently serious," courts look to the *effect* of any delay in treatment caused by an officer's inaction. Specifically, a pretrial detainee "who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier, 238 F.3d at 742* (quoting *Hill, 40 F.3d at 1188); see also Gaudreault v. Municipality of Salem, 923 F.2d 203, 208-09 (1st Cir. 1990)* ("The 'seriousness' of an inmate's needs may also be determined by reference to the effect of the delay of treatment."), *cert. denied, 500 U.S. 956, 114 L. Ed. 2d 718, 111 S. Ct. 2266 (1991).*

Vaughn has failed to provide verifying medical evidence to meet the objective component of *Farmer.* The medical records show that he was treated for various injuries and conditions after several of his arrests. Yet, there are no medical records or statements by treating physicians that the few hours Vaughn was kept in custody on each occasion had any discernable "detrimental effect" on his health. The treating physicians [**60] analogized his symptoms to a case of "poison ivy" and averred that they "were not permanent." (J.A. 768.) In fact, for purposes of summary judgment, Vaughn admitted that none of his "more serious alleged injuries"--including "scarring, headaches, corneal scars, loss of vision, loss of hearing, spontaneously reoccurring [*275] burns and emotional distress"--were causally connected to his alleged exposure to Freeze +P. (*Id.*) While the discomforting effects of pepper spray in general, and Freeze +P specifically, are not at issue here, there is no medical evidence to show that his injuries were somehow exacerbated by any short delay in treatment caused by defendants. n14 Likewise, while the "obviousness" of his cuts, bruises, and abrasions may have been visible, the medical records demonstrate that he did not exhibit any medical needs "so patent as to make lay persons such as [defendants] remiss in failing

to arrange for immediate medical attention." *Gaudreault, 923 F.2d at 208.*

n14 *See, e.g., Wesson v. Oglesby, 910 F.2d 278, 284 (5th Cir. 1990)* (state prisoner's swollen, bleeding wrists from handcuffs that were too tight "do not constitute such a 'serious medical need' that any minor delay caused by [prison officials] in delivering [inmate] to the care of medical personnel could be construed as 'deliberate indifference'"); *Martin v. Gentile, 849 F.2d 863, 871 (4th Cir. 1988)* (while sliver of glass in detainee's palm "was no doubt uncomfortable," it nevertheless "was not a serious injury" and fourteen-hour delay in medical treatment "did not violate his constitutional rights" because cuts and bruises were "minor" and "did not require either stitches or painkiller"); *Dickson v. Colman, 569 F.2d 1310, 1311 (5th Cir.)* (per curiam) (county inmate's high blood pressure presented "'no true danger' or 'serious threat' to his health," and he also had full range of motion in his shoulder despite continuing pain from a three-year-old injury; further, he obtained a medical examination the day after he requested it), *cert. denied, 439 U.S. 897, 58 L. Ed. 2d 244, 99 S. Ct. 259 (1978).*

[**61]

Moreover, Vaughn's own inaction after several of the encounters seriously calls into question any assertion that a delay caused by defendants resulted in a Due Process violation. After his first arrest, Vaughn did not seek out medical treatment, but rather had his father take photographs of his injuries before taking him home. (J.A. 336.) After the second arrest, his father picked him up the following morning and took pictures of him before taking him to the hospital. It is unclear when Vaughn arrived at the hospital, but his release time is listed as 6:50 p.m. (J.A. 313.) After his third arrest, his father picked him up from jail the following morning, but waited until late afternoon to take him to the emergency room, after again taking more photographs. (J.A. 313, 318, 336.) After the fourth arrest, he waited more than two days before seeking medical treatment. (J.A. 323.) After the fifth arrest, he did seek medical treatment on the day of his release, but again waited several hours before going to the emergency room. (Vaughn claims he sought treatment "immediately" after being released from jail on the morning of November 11, 1995, but the reported entrance time listed on his medical [**62] record is 3:06 p.m. (J.A. 326.)) Finally, after his sixth arrest, Vaughn was only held "in custody" for a short period. While Bare arrested him and transported him to the county jail, the jail refused to hold him because, in plaintiff's words, "I wasn't drunk." (J.A. 2044.) He was released to his father shortly after Bare brought him in, and he sought treatment from Dr. Warren the next day.

While subjective feelings of pain may, if sufficiently egregious, satisfy the objective component of *Farmer,* the record in this case does not support such a finding. As noted above, there is nothing in the record before us that plaintiff made complaints to either Bowen, Smith, or Bare after the intended effects of the spray could have expected to have worn off under normal conditions. Moreover, he was detained for only a few hours on five of the six encounters, and for even less on the sixth. Thus, this case is distinguishable from *Cooper v. Casey, 97 F.3d 914, 917 (7th Cir. 1996),* where prisoners were beaten and sprayed with pepper spray, but [*276] left without any medical attention for over 48 hours, despite their frequent requests for help. In the instant matter, Vaughn's short [**63] delays in treatment for his discomfort and mild injuries, while unfortunate, simply were not "sufficiently serious" to rise to the level of a Due Process violation. Accordingly, remand to the district court on his claims of deliberate indifference to a serious medical need is not warranted.

### III. CONCLUSION

For the reasons provided above, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's grant of summary judgment to defendants in these five separate causes of action, and **REMAND** to the district court for further proceedings on Vaughn's claims of excessive force against defendants Bowen (Nos. 99-6670 and 99-6672); Wells (No. 99-6673); Smith (No. 99-6676); and Bare (99-6675).