EXHIIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (DAYTON)

PLAYTEX PRODUCTS, INC.,

           Plaintiff,

    v.

THE PROCTOR & GAMBLE
DISTRIBUTING COMPANY,

           Defendant.

CASE NO. C-1-02-391

(Hon. Thomas M. Rose)

REPORT OF EVAN HUTCHISON
PURSUANT TO FED. R. CIV. PROC.
26(a)(2)

DEFENDANT'S
EXHIBIT
66
4-3-03

## I.    Introduction

I am currently employed by Plaintiff Playtex Products, Inc. ("Playtex") as Vice President, Product Development R&D. In this capacity, I manage all product development activities for Playtex. I have been asked by counsel for Playtex to provide an opinion regarding whether claims 1, 2, 3, 9 and 10 of Playtex's U.S. Patent No. 4,536,178 ("the '178 patent") are infringed by the Tampax Pearl Plastic tampon applicator ("Pearl Plastic applicator"). As explained in more detail below, it is my opinion that the Pearl Plastic applicator infringes claims 1, 2, 3, 9 and 10 of the '178 patent.

## II.    Professional Background

I have attached my curriculum vitae as Exhibit A, but a brief review of my credentials is as follows:

I was granted a double degree in Mechanical Engineering and Public Policy from Carnegie-Mellon University, Pittsburgh, PA in 1974. My first 17 years of professional experience was with Eastman Kodak Company in Rochester, NY, where I worked in a series of assignments responsible for manufacturing equipment design projects, product and package design projects, and the management of groups of design and development engineers. My efforts resulted in new products and processes for Kodak's consumer and medical imaging divisions, the medical diagnostics division, and the granting of five US and several foreign patents.

In 1991 I relocated to a Kodak subsidiary, Sterling Drug Company's L&F Products, as Director of Engineering. I was involved in the management of all product development projects, package development, corporate project management, and all company capital spending for plant and equipment. My efforts resulted in the improvement of existing products and the launch of new products for such brands as Lysol, Resolve, Wet Ones, Ogilvie, Chubs, DCon, Thompsons & Minwax.

In 1995, L&F was merged with Reckitt & Colman's business worldwide, at which point I

1

was made responsible for the package engineering and development efforts in North America, with later additions of South America, global category product leadership, and process development. Additional product exposure was gained by supporting brands such as Woolite, French's Mustard, Wizard Air Fresheners, Spray N Wash, Glass Plus, and many other brands available elsewhere around the world.

In early 2000, at the point of Reckitt & Colman's merger with Benckiser, I left to join Playtex as head of R&D for several product lines. These included the Playtex branded tampon business, and all the infant care products branded Playtex, Diaper Genie and Binky. This responsibility was expanded in mid 2001 to include all product development responsibility for the remainder of the product line including Banana Boat sunscreens, Baby Magic toiletries, Binaca, and Woolite Carpet Cleaners, among others.

### III.    Materials I have Relied Upon

In forming my opinion I have made use of my background and experience in the consumer products and feminine hygiene fields. I have also reviewed the following materials:

- the '178 patent
- the prosecution history of the '178 patent
- a sample of the Pearl Plastic applicator
- Internet website accessed at www.tampaxpearl.com, especially sections titled "Discover Tampax Pearl," both 'plastic applicator' and 'grip' subsections
- Observations and measurements of sample Pearl Plastic applicators made on optical comparator equipment

I have prepared this report without seeing any documents or deposition testimony from P&G in this case. I reserve the right to amend or supplement this report to the extent any such discovery is relevant.

### IV.    Claim Construction

I understand that infringement is evaluated in two steps. First, the meaning of the asserted claims are construed. Second, the claims, as construed, are compared to the accused

2

product.

I also understand that claim terms should be given their ordinary meaning to a skilled tampon applicator designer, unless a different meaning is defined by the patent's written description or prosecution history. I have read claims 1, 2, 3, 9 and 10 of the '178 patent, and I understand their meaning without needing to look at the written description or prosecution history. Furthermore, I also read the written description and prosecution history to confirm that the terms of the asserted claims were not given any special meaning other than the ordinary meaning.

I further understand that the Court will be required to construe the meaning of the asserted claims. I reserve the right to amend or supplement my report in the event that the Court gives the claim terms any meaning contrary to that expressed in this report.

### V.    Infringement Opinions

I will now analyze whether the Pearl Plastic applicator infringes Claims 1, 2, 3, 9 and 10 of the '178 patent by comparing each of the asserted claims to the accused product:

### A.    Claim 1

The first claim of the '178 patent covers an invention defined as:

A tampon applicator comprising:

a tubular barrel adapted to house and carry a tampon therein and a slideable, tubular plunger telescopically engageable with said barrel and operable to push the innermost end of the tampon within the barrel out of the forward end of the barrel into a vagina;

said tubular barrel comprising:

(a) a cylindrical front portion adapted to house said tampon;

(b) a rearward portion adapted to partially house and engage said plunger, said rearward portion of said barrel comprising diametrically opposed substantially flattened surfaces; and

(c) a transitional section between said rearward portion and said front portion, said transitional section having a reduced diameter relative to said front portion of said

3

barrel;

whereby said flattened surfaces and said transition section provide
a finger and thumb hold enabling a user to comfortably eject and
control the position of said tampon.

It is my opinion that the Pearl Plastic applicator meets each of those limitations literally.
The Pearl Plastic applicator consists of two parts: (1) a tubular barrel that houses and carries a
tampon; and (2) a slideable, tubular plunger that is telescopically engageable with the rear of the
barrel, and which is designed to push the innermost end of the tampon out of the front of the
barrel.

The Pearl Plastic applicator also literally meets each of the limitations that apply to the
"tubular barrel." First, the tubular barrel of the Pearl Plastic applicator has a cylindrical front
portion that is adapted to house the tampon. Second, it has a rearward portion that is adapted to
partially house and engage the plunger, and the rearward portion of the tubular barrel has two
diametrically opposed substantially flattened surfaces. Third, the Pearl Plastic applicator has a
transitional section between the rearward portion and the front portion, and the transitional
section has a reduced diameter relative to the front portion of the tubular barrel. Fourth, the
substantially flattened surfaces of the rearward portion and the transitional section provide a
finger and thumb hold that enables the user to comfortably eject and control the position of the
tampon. Indeed, the Pearl Plastic applicator's internet web site states that: "The grip's contoured
shape – makes it easier to hold, enabling you to position the applicator comfortably, gently, and
effectively." *See* Exhibit B.

**B.    Claim 2**

The second claim of the '178 patent covers the following:

The applicator of claim 1, wherein said transitional section
comprises two diametrically opposed, angled shoulder surfaces.

Thus, Claim 2 contains all of the limitations of Claim 1 and an additional limitation
relating to the "transitional section." The Pearl Plastic applicator meets this additional limitation
because the transitional section between the tubular front portion of the barrel and the

4

substantially flattened rear portion of the barrel has two diametrically opposed, angled shoulder surfaces. These surfaces were measured using an optical comparator focusing on the profile whereupon a flat angled shoulder surface of at least .030 inches was observed. An electronic photograph of this sample is attached as Exhibit C. Therefore, it is my opinion that the Pearl Plastic applicator literally infringes Claim 2 of the '178 patent.

### C.    Claim 3

The third claim of the '178 patent covers the following:

> The applicator of claim 1 wherein said flattened surfaces comprises a plurality of spaced apart ribs.

Accordingly, Claim 3 contains all of the limitation of Claim 1 and an additional limitation relating to ribs on the "flattened surfaces" of the rear portion of the barrel. The Pearl Plastic applicator has this limitation because there are several curved spaced apart ribs on the flattened surfaces of its rearward portion. In this regard, it should be noted that the specification of the '178 patent specifically states that "curved" ribs may be used to enhance the grip: "Although the ribs or treads are configured in a straight and raised design, a stepped and / or curved design may be alternatively selected" (Col. 4/19-23). The Pearl Plastic applicator's internet web site states that the grip is: "textured on both sides to help reduce slipping as you hold the applicator and insert the tampon." *See* Exhibit B. Thus, it is my opinion that the Pearl Plastic applicator literally infringes Claim 3 of the '178 patent.

### D.    Claim 9

The ninth claim of the '178 patent covers the following:

> The applicator of claim 1 further comprising means for limiting the movement of said plunger through said rearward portion of said barrel.

Accordingly, Claim 9 contains all of the limitations of Claim 1 and an additional limitation regarding the movement of the plunger through the rear portion of the barrel. The Pearl Plastic applicator has this limitation because the plunger cannot slide all the way into the rear portion of the barrel, nor can it slide all the way out of the rear portion of the barrel. Instead,

5

the Pearl Plastic applicator is designed so that, under normal use conditions, the plunger will remain engaged with the rear portion of the barrel.   Therefore, it is my opinion that the Pearl Plastic applicator literally infringes Claim 9 of the '178 patent.

**E.    Claim 10**

The Tenth Claim of the '178 patent covers the following:

> The applicator of claim 9 wherein said limiting means comprises a first curled lip integral with the inner end of said plunger and engageable with said transition portion and a second curled lip integral with the outer end of said plunger and engageable with said rearward portion.

Therefore, Claim 10 contains all of the limitations of Claim 9 and an additional limitation relating to the specific means of how the "plunger" is prevented from moving all the way into or out of the barrel.   The Pearl Plastic applicator's plunger has two curled lips, the first of which is integral with the inner end of the plunger and engageable with the transition portion, and a second curled lip integral with the outer end of the plunger and engageable with said rearward portion of the barrel.  Accordingly, it is my opinion that the Pearl Plastic applicator literally infringes Claim 10 of the '178 patent.

**VI.    Compensation**

I am not receiving any compensation, other than my regular salary from Playtex, for this study.

**VII.    Previous Expert Testimony**

I have not testified as an expert at trial or by deposition within the last four years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Allendale, New Jersey on October 30, 2002

Evan Hutchison

6

EXHIBIT A

# EVAN W. HUTCHISON

41 Crystal Farm Road
Warwick, NY 10-990
845-986-9691
201-785-8144 (office)


CARNEGIE-MELLON UNIVERSITY / 1974
Pittsburgh, PA
B.S. Mechanical Engineering and Public Policy (Dual Major)


## PLAYTEX PRODUCTS, INC.
Allendale, NJ

### RESEARCH & DEVELOPMENT DIVISION

VICE PRESIDENT, PRODUCT DEVELOPMENT / 2001 – Present

- Responsible for the product development activities for all the company's products. This
  position also includes the responsibility for package development and corporate project
  management.

VICE PRESIDENT, ENGINEERING TECHNOLOGY / 2000 – 2001

- Responsible for the product development activities in the Feminine Care, Infant Care, and
  Premoistened Towelettes areas, as well as all package development and corporate project
  management


## RECKITT & COLMAN, INC.
Wayne, NJ

### RESEARCH AND DEVELOPMENT DIVISION

VICE PRESIDENT, ENGINEERING TECHNOLOGY NORTH AMERICA / 1997 – 2000

- Responsible for package design & development and process development &
  engineering for North America. Responsibility for the process development and
  aerosol engineering groups added to the packaging responsibilities of previous
  position. This position created to be the primary interface between the R&D and
  Manufacturing organizations.

DIRECTOR, PACKAGE ENGINEERING & DEVELOPMENT, THE AMERICAS / 1996-97

- Responsible for package design and development for North and South America.
  Also responsible for development of global packaging strategy for Surface Care
  Category. Department designated lead technical center for Global Surface Care

and Disinfecting Lavatory Care. Also responsible for major North American food business packaging.

## MANUFACTURING AND LOGISTICS DIVISION

DIRECTOR, PACKAGE ENGINEERING & DEVELOPMENT, NORTH AMERICA / 1995-96

- Responsible for package design and development for United States, Canadian and Caribbean business. Led transition of product specifications and new product development through the merger of L&F and Reckitt & Colman businesses.

# L&F PRODUCTS
Montvale, NJ

## MANUFACTURING & DISTRIBUTION DIVISION

DIRECTOR OF ENGINEERING / 1991-95

- Responsible for all engineering activities of the company. These include package development and engineering, industrial engineering, mechanical engineering, corporate project management, and plant engineering. Position was the focal point for all engineering product design and development, and carried primary responsibility for the division's capital budget, capacity planning, and cost improvement efforts.

# EASTMAN KODAK COMPANY
Rochester, NY

## CONSUMER IMAGING FINISHING DIVISION

PACKAGING DEVELOPMENT MANAGER / 1988-91

- Responsible for the manufacturing leadership of major film packaging projects, including design and development of packages and manufacturing processes. Included worldwide capital budget, unit manufacturing cost, and environmental impact analysis of both existing and new product lines. Position was the major interface between manufacturing, marketing, and business planning groups for consumer film packaging.

## KODAK PARK ENGINEERING DIVISON

UNIT DIRECTOR, AUTOMATIC MACHINE SYSTEMS DIVISION / 1986-88

- Supervisor of 36 mechanical and electrical design engineers and technicians. Responsible for capital and development projects in Quality Control Systems and Specialty Equipment Design Unit. Major customers were Clinical Products, Copy Products, and Consumer Products Business Units.

## INNOVATION OFFICE FACILITATOR, ENGINEERING DIRECTOR'S STAFF / 1984-86

❏ Responsible for technical, marketing, and business case analysis of proposals for new Kodak products, venture companies, and internal technologies. Ensured that appropriate levels of funding and support were provided by diverse worldwide corporate organizations.

## MACHINE DESIGN AND SENIOR PROJECT ENGINEER / 1974-84

❏ Responsible for equipment design and development project for film and medical products converting and packaging. This period included assignments as Maintenance Engineer and Packaging Development Coordinator. Ultimate responsibility as Project Manager for $4 million design and construction of a computer-integrated packaging facility for clinical chemistry slides.

- Co-holder of five U.S. and numerous international patents

- Member of American Society of Mechanical Engineers, 28 years

EXHIBIT B

2.4 Disc    Tampax Pearl - Braid

Discover Tampax Pearl | Pearl Buzz | About Tampax Pearl | Get Real/Facts

Home > Discover Tampax Pearl > Grip

Overview

Plastic Applicator

Expansion

Braid

Grip

Wrapper

Product Line-up

### Discover Tampax Pearl—Grip

An extraordinary innovation.

Only Tampax Pearl features this unique contoured grip. It's textured on both sides to help reduce slipping as you hold the applicator and insert the tampon.



Better
Comfort.
Better
Protection.*

The grip's contoured shape - makes it easier to hold, enabling you to position the applicator comfortably, gently, and effectively. Pearl's unique contoured grip is just one more detail that sets Tampax Pearl apart from other tampons.

*versus the leading plastic

TSS and Tampon Safety | Privacy Statement | Terms & Conditions

P&G © Copyright 2002

EXHIBIT C



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION (DAYTON)

| | |
|---|---|
| PLAYTEX PRODUCTS, INC., a<br>Delaware corporation,<br><br>          Plaintiff,<br><br>     v.<br><br>THE PROCTOR & GAMBLE<br>DISTRIBUTING COMPANY, an Ohio<br>corporation, and THE PROCTOR &<br>GAMBLE COMPANY, an Ohio<br>corporation,<br><br>          Defendants, | CASE NO. C-1-02-391<br><br>(Hon. Thomas M. Rose)<br><br>REBUTTAL EXPERT REPORT<br>OF EVAN HUTCHISON |

I.    **OVERVIEW**

On October 20, 2002, I submitted a report in which I stated my opinion that the

P&G Pearl Plastic tampon product infringes Claims 1, 2, 3, 9 and 10 of U.S. Patent No.

4,536,178 (the "'178 patent"). In this report, I respond to the expert report of James Moller

dated November 26, 2002 in which he offers the opinion that the above-stated claims of the '178

patent are not infringed by the Pearl Plastic tampon product. In addition to the materials set forth

in my October 20, 2002 report, I have also reviewed the Moller report as well as Exhibits A

through M of that report. I incorporate my October 20, 2002 report herein by reference. I

reserve the right to amend or supplement my report based on the claim construction adopted by

the Court.

II.    **SUMMARY**

The only term of the asserted '178 patent claims which Dr. Moller contends is not

present in the Pearl Plastic product is the term "substantially flattened surfaces." Dr. Moller's

opinion is predicated on the assumption that the words "substantially flattened" should be

NY\740523.2

construed to mean "flat." He then goes on to opine that because the sides of the finger grip area of the Pearl Plastic applicator have some curvature, they are not covered by the "substantially flattened surfaces" claim term.

I disagree with Dr. Moller's interpretation of "substantially flattened." A person of ordinary skill in the art would give these words their ordinary meaning, i.e., generally flat or flatter. In other words, surfaces which are not entirely flat, but instead have some curvature, whether that curvature is convexity or concavity, are encompassed within the meaning of this term. When "substantially flattened" is given its ordinary meaning, my opinion is that the elongated finger grip surfaces of the Pearl Plastic applicator are "substantially flattened surfaces" despite the fact that the elongated surfaces have some curvature to them.

Finally, even if Dr. Moller's erroneous claim interpretation were to be adopted, it is my opinion that the finger grip surfaces of the Pearl Plastic product are equivalent to flat surfaces, since they perform substantially the same function in substantially the same way to achieve substantially the same result.

## III.    OPINIONS

In Section III A of his report, Dr. Moller offers his view as to the meaning of the claim term "substantially flattened surfaces." See Moller Rep. at 3-4. In particular, he says that "substantially" is not a term of accuracy and thus has no generally understood meaning to those of skill in the art. He therefore concludes that the term "substantially flattened surfaces" has no plain meaning. Id. at 3.

I disagree with Dr. Moller for the following reason. Contrary to Dr. Moller's report, a person of ordinary skill in this art would not look to sources such as his exhibits C, E, H or J to determine the meaning of the word "substantially." Rather, one of ordinary skill would understand this word is not a term of art in the field and would therefore give the word its plain, ordinary meaning, i.e., "generally." The absence of the word "substantially" from the materials

collected in Exhibits C, E, H and J of the Moller report confirms that the word is not a term of art in the field. In addition, a review of the '178 patent specification confirms this plain meaning, since the words "substantially" and "generally" are used interchangeably in the specification to describe the flattened surfaces. The following portions of the specification refer to the surfaces as "substantially flattened": Col. 2, line 26 and Col. 2, lines 37-38. In addition, the claims refer to these same surfaces as "substantially flattened." The following portions of the specification refer to these same surfaces as "generally flattened": Col. 3, line 55; Col. 4, line 15 and Col. 4, line 33.

In addition, a person or ordinary skill would understand that the word "flattened" is not a term of art in the field and would give this word its ordinary meaning, i.e., "made flat or flatter." Accordingly, when the words "substantially flattened" are read together to modify the word "surfaces", the plain meaning of the term is surfaces which have been made generally flat or flatter. This meaning is clearly broader than simply "flat" as Dr. Moller contends. To the contrary, the term "substantially flattened surfaces" includes surfaces which are generally flat or flatter, even if they have some curvature, whether it be convexity or concavity.

Dr. Moller next refers to the '178 patent specification as disclosing two embodiments of thumb and finger hold surfaces: (1) surfaces which appear to be flat except for protruding ribs and (2) surfaces which have been provided with a concavity or accurate depression. See Moller Rep. at 4. From this disclosure, Dr. Moller concludes that "[t]he term 'substantially flattened surfaces' to the extent it has any meaning, thus refers to a flat surface." Id. I disagree with Dr. Moller for the following reasons: First, I understand that it is improper to read the exemplary embodiments disclosed in the patent specification into the claims. Although the '178 patent specification discloses the two embodiments referred to above, it is my understanding that it is improper to limit the plain meaning of "substantially flattened surfaces"

to these two examples. In this regard, I note that at Col. 5, lines 55-60, the '178 patent specification states:

> The foregoing specification and drawings are merely illustrative of the invention and are not intended to limit the invention to the disclosed embodiment. Variations and changes which are obvious to one skilled in the art are intended to be within the scope and nature of the invention which are defined in the appended claims.

Second, there is an inconsistency in Dr. Moller's opinion. He recognizes that the specification shows an embodiment where the substantially flattened surfaces are not exactly flat. This is the arcuate depression referred to in Col. 4, lines 21-24. His conclusion that "substantially flattened surfaces" must mean a flat surface is at odds with his acknowledgment that the specification provides an example where the surfaces are not exactly flat. For this same reason, I disagree with Dr. Moller's assertion (at page 4 of his report) that the specification does not support an interpretation in which the surfaces are entirely curved or convex.

Dr. Moller asserts that "extrinsic sources, to the extent that it is necessary to consult them, do not support an interpretation that permits an entirely curved surface to be called "substantially flattened." Moller Rep. at 4. However, the extrinsic source to which he refers, his Exhibit E, provides an explanation of the word "flatness." As noted above, "flat" or "flatness" is different than the claim term at issue, which is "substantially flattened." Accordingly, explanations of the meaning of "flatness" do not, in my opinion, assist in ascertaining the meaning of the claim term at issue.

Since I disagree with Dr. Moller's opinion that "substantially flattened" means "flat," I further disagree with his conclusion that because the elongated surfaces of the Pearl Plastic finger grip area have some curvature, they do not meet this claim term. See Moller Rep. at 5-12. Dr. Moller spends several pages reporting experiments he has run and mathematical calculations he has performed to show that the finger grip surfaces of the Pearl Plastic applicators have some curvature. Id. In my opinion, one can see that the surfaces have some

curvature simply by inspecting them. Based on my opinion that "substantially flattened surfaces" includes surfaces which have some curvature so long as they are generally flat or flatter (than, for example, a circle or a cylinder), the slight curvature of the elongated sides of the Pearl Plastic finger grip area does not allow P&G to escape infringement. This is because, despite the curvature to which Dr. Moller goes to great lengths to document, the two surfaces of the Pearl Plastic finger grip area remain "substantially flattened."

For the reasons set forth above and in my report of October 20, 2002, it is my opinion that the Pearl Plastic tampon product includes all of the elements of Claims 1, 2, 3, 9 and 10 of the '178 patent, including the claimed "substantially flattened surfaces." Accordingly, Pearl Plastic literally infringes Claims 1, 2, 3, 9 and 10.

It is also my understanding that, even if a claim element is not literally present in an accused product, infringement may still be found under the Doctrine of Equivalents if the accused device performs substantially the same function in substantially the same way to achieve substantially the same result as the claim element which is not literally present. In other words, infringement occurs where each element of the claim is found either literally or equivalently in the accused device.

In this case, Dr. Moller implicitly concedes that all of the elements of Claims 1, 2, 3, 9 and 10 of the '178 patent are literally present in the Pearl Plastic product with the exception of "substantially flattened surfaces." As noted above, my opinion is that this element is also literally present in the Pearl Plastic product. However, even if Mr. Moller's erroneous construction of "substantially flattened surfaces" as meaning "flat surfaces" were to be accepted, it is my opinion that this claim element would still be present equivalently in the Pearl Plastic product, since the elongated, slightly curved surfaces of the Pearl Plastic product perform substantially the same function in substantially the same way to achieve substantially the same result.

NY\740523.2                                          5

As set forth in the '178 patent specification, the function of the finger grip area of the patented applicator, in cooperation with the transitional section, is to "significantly reduce the amount of involuntary rotation in comparison with the use of a conventional applicator having a cylindrical barrel." '178 patent, Col. 2, lines 63-68. See also Col. 2, lines 25-33. The way that this function is achieved under Dr. Moller's claim construction is to make the surfaces flat, thereby resulting in a "significantly greater surface contact area (finger/applicator interface) in comparison to a conventional applicator having a relatively cylindrical barrel." Id., Col. 2, lines 58-63. The result achieved is to significantly reduce the lack of control during insertion providing "a consumer perceptible, enhanced feeling of security, comfort and control which is theorized to be a result of a reduced level of muscle tension required to maneuver the applicator and deploy the tampon from the applicator." Id. Col. 2, line 66 to Col. 3, line 6. See also Col. 5, lines 27-41 (noting that the finger and thumb hold of the invention enhances stability in maneuvering and positioning the applicator and reduces or eliminates slip or play, thereby reducing muscle tension).

The Pearl Plastic finger grip surfaces, which are elongated but slightly convex, perform substantially the same function as the "substantially flattened surfaces" under Dr. Moller's construction of that term. The elongated, slightly convex shape of the surfaces, in cooperation with the transitional section, also function to reduce rotation and thereby reduce or eliminate slip or play during insertion and ejection. The Pearl Plastic finger grip surfaces perform that function in substantially the same way as the "substantially flattened surfaces" under Dr. Moller's claim interpretation; i.e., by providing, in cooperation with the transitional section, a significantly greater surface contact area at the finger/applicator interface as compared with conventional cylindrical applicators. Finally, the Pearl Plastic finger grip surfaces achieve substantially the same result as the "substantially flattened surfaces" under Dr. Moller's claim interpretation; i.e., they provide an enhanced feeling of consumer comfort and control during

insertion and ejection of the tampon.  P&G's website marketing the Pearl Plastic has this to say:
"The grip's contoured shape makes it easier to hold, enabling you to position the applicator
comfortably, gently and effectively."  See Exhibit B to my October 20, 2002 report.

_____
Evan Hutchison

December 27, 2002