EXHIBIT 4

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

Page 1

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. Texas, Dallas
Division.

ASPEX EYEWEAR, INC.,
Plaintiff-counterdefendant,
v.
E'LITE OPTIK, INC., Defendant-counterplaintiff.

**No. CIV.A. 398CV2996D.**

April 4, 2002.

MEMORANDUM OPINION AND ORDER

FITZWATER, District J.

*1 In this case involving U.S. Patent No. 5,568,207
("the '207 patent"), "Auxiliary Lenses for
Eyeglasses," plaintiff-counterdefendant Aspex
Eyewear, Inc. ("Aspex") and
defendant-counterplaintiff E'Lite Optik, Inc.
("E'Lite") have filed nine motions that present
questions about standing, proper parties,
infringement, patent validity, expert testimony, and
damages. The court decides these motions by this
memorandum opinion and order. [FN1]

> FN1. All requests for oral argument of one
> or more of these motions are denied. *See*
> N.D. Tex. Civ. R. 7.1(g).

I

The court has previously set out certain of the
background facts of this case in an opinion that
addressed claim construction. *See Aspex Eyewear,
Inc. v. E'lite Optik, Inc.,* 2001 WL 204775, at *1
(N.D.Tex. Feb. 27, 2001) (Fitzwater, J.). The court
will add to that discussion the relevant facts and
procedural history necessary to place today's
decisions in context.

This case involves spectacle frames that support an
auxiliary frame, enabling the user to securely fasten
a second set of lenses (often sunglass lenses) onto

the primary frame (often holding prescription
lenses). Previous mechanisms for attaching
additional lenses to eyeglasses relied either on clips
or magnets mounted on the front of the primary
frames. The design described by the '207 patent
allows for a more stable, secure attachment of the
auxiliary frame through a structural arrangement
included in the frames. The invention involves
projections on the rear and side portions of the
primary frames and arms on the side portions of the
auxiliary frames. Magnets secured in the projections
of the primary frames engage with magnets secured
in the arms of the auxiliary frames when the arms of
the auxiliary frames are extended over and
supported on the upper side portions of the primary
frames. This ensures that the auxiliary frames will
not move downward relative to the primary frames.
*Id.*

The '207 patent issued to Richard Chao ("R.Chao")
on October 22, 1996. He assigned his rights in the
patent to Contour Optik, Inc. ("Contour") on
January 24, 1997. On February 1, 1997 Contour
entered into a license agreement with Ira Lerner,
Inc., d/b/a Manhattan Design Studio ("MDS"),
under which MDS obtained the exclusive right to
distribute, market, and sell in the United States
eyewear protected by the '207 patent. By letter
dated March 23, 1998, Contour's legal counsel
informed MDS' attorneys that, due to MDS' failure
to take remedial action in response to Contour's
previous notice of material breach and demand for
cure, Contour was terminating the license
agreement, effective immediately. On March 25,
1998 Contour informed the president of Chic Optic
("Chic") that the license agreement with MDS had
terminated, and Contour granted Chic the same
exclusive rights that MDS had held. On March 26,
1998 Chic granted Aspex what it termed an
exclusive sublicense under the '207 patent.

Contour eventually filed a demand for arbitration
against MDS alleging breaches of the February 1,
1997 license agreement. On May 14, 1999 the
arbitration panel ruled that MDS had breached the
agreement. In December 1999 Contour and MDS
entered into a written settlement agreement under
which MDS was precluded from representing that it
retained any rights in the '207 patent except as may
be expressly authorized in writing by the patent
owners.

*2 Meanwhile, the '207 patent had become the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                          Page 2
(Cite as: 2002 WL 1751381 (N.D.Tex.))

subject of an interference proceeding in the United States Patent and Trademark Office ("PTO") between Contour and Asahi-Optical Co., Ltd. ("Pentax"), owner of another patent application. The purpose of the interference was to determine which invention-- the one protected by the '207 patent or the one protected by Pentax's patent application--was invented first. On March 30, 2000 Contour and Pentax resolved the interference proceeding by entering into a settlement agreement. Contour and Pentax agreed to a private means of determining which invention came first. They also agreed that they would co-own the patent or application that protected the invention, and the other patent or application would be terminated. The '207 patent was declared the surviving patent and is now co-owned by Contour and Pentax.

Pentax had previously licensed its rights under its patent application to MDS. That license survived under the settlement agreement between Contour and Pentax, as did Aspex's sublicense under Chic's license of the '207 patent. As of February 8, 2000 Aspex had purchased all outstanding shares of capital stock in MDS, and MDS is now a division of Aspex.

E'Lite also sells eyeglasses that allow the user to attach an auxiliary frame to a primary eyeglass frame. Aspex alleges that E'Lite's Smart Clip and Mac Eye models of eyewear infringe the '207 patent. E'Lite defends Aspex's infringement action on several grounds, and it seeks relief by way of a counterclaim.

II

Although the parties have filed nine motions that are the subject of this decision, it appears most logical to begin with E'Lite's motion to dismiss for lack of standing. "It is well established ... that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Ark.,* 495 U.S. 149, 154 (1990).

A

E'Lite contends that Aspex lacks Article III standing because it has no rights in the '207 patent. It maintains that Aspex is neither the patentee, assignee, nor exclusive licensee. E'Lite asserts that

Aspex is at best a non-exclusive licensee.

The Patent Act of 1952 provides that "a patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term "patentee" includes the successors in title to the patentee. *See* 35 U.S.C. § 100(d). Without the patentee as plaintiff, the remedies provided in the patent statute are unavailable except in extraordinary circumstances, such as when the patentee is the infringer and cannot sue himself. *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 40-41 (1923) (holding that plaintiff must have legal title to patent at time of infringement).

On March 16, 1998, while MDS was still Contour's exclusive licensee of the '207 patent, Contour granted Chic the option to act as its exclusive licensee "immediately upon termination by [Contour] or any other party or tribunal of any existing agreement(s) of [Contour] related to [the '207 patent] and goods made according to this patent." P. Standing App. 13. This option agreement included Chic's right to grant sublicenses to other parties. *Id.* In a March 25, 1998 letter, Contour informed Chic that on March 23 it had terminated its exclusive license agreement with MDS and that pursuant to its option agreement, Chic "ha[d] the right in the United States of America, to import, distribute and sell frames covered by [the '207 patent]." *Id.* at 11. A panel of arbitrators ultimately decided that MDS had breached its contracts with Contour by entering into a distribution agreement with another company, *see* D. Standing App. 48, thereby legitimizing Contour's decision to terminate its exclusive license agreement with Chic. As of March 25, 1998 Chic, by virtue of the terms of its earlier option agreement with Contour, possessed rights as a licensee of the '207 patent.

*3 On March 26, 1998 Chic exercised its rights by sublicensing them to Aspex. *See* P. Standing App. 31. As of that date, Aspex possessed rights as a '207 patent licensee. E'Lite emphasizes, however, a subsequent agreement between Contour and Chic, dated April 7, 1998. In this agreement, Contour and Chic "amend, re-state and supercede in their entirety" the "five prior written understandings" between the two parties, which include the March 16 option agreement. *Id.* at 17. According to E'Lite, this means the April 7 document is the one that actually grants Chic a license in the '207 patent,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                                            Page 3
**(Cite as: 2002 WL 1751381 (N.D.Tex.))**

which, in turn, means that the March 26 agreement between Chic and Aspex conveys no such rights to Aspex, since Chic possessed no such rights at that time. Under this logic, because there is no evidence of a sublicense agreement between Chic and Aspex after April 7, Aspex has no rights in the '207 patent and thus no standing to sue E'Lite.

But E'Lite misapprehends the nature of the March 16 and April 7 agreements between Contour and Chic. On March 16 Contour granted Chic an option that would become a license immediately upon termination of Contour's agreement with MDS, which subsequently occurred on March 23. Chic thus possessed rights as a licensee of the '207 patent as of March 23, 1998, and Contour confirmed as much in its March 25 letter to Chic. Chic's March 26 agreement with Aspex therefore conveyed rights in the '207 patent. The final agreement between Contour and Chic merely combined and expanded on a series of prior agreements and in no way purported to alter the conveyance of the license to Chic or Chic's rights to convey in turn a sublicense to another party. The fact that this contract was signed on April 7 is therefore immaterial to the question of standing because, as of that date, Aspex already possessed the rights it seeks to enforce in the instant suit. E'Lite's contention that Aspex has no rights in the '207 patent is therefore without merit.

### B

E'Lite contends in the alternative that Aspex is a nonexclusive or bare licensee of the '207 patent rather than an assignee or exclusive licensee. It maintains that Aspex lacks standing to sue either in its own name or as a coplaintiff with the patentee.

Courts examine the substance of an agreement to determine whether it has the effect of either an assignment or an exclusive license and thus satisfies the statutory requirement that the "patentee" must sue. *See Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1030 (Fed.Cir.1995). Where a patentee makes an assignment of all significant rights under the patent, the assignee may be deemed the effective "patentee" under the statute and has standing to sue in his own name for infringement, without joining the actual patentee. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875 (Fed.Cir.1991) (holding transfer of substantially all rights to be assignment).

There are three ways in which a patentee can assign to an assignee all significant rights under a patent: by conveying the entire patent, an undivided part or share of the entire patent, or all rights under the patent in a specified geographical region of the United States. *Rite-Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1551 (Fed Cir.1995) (citing *Waterman v. Mackenzie,* 138 U.S. 252, 255 (1891)). "A transfer carries less than one of these three interests is a license, not an assignment of legal title, and it gives the licensee no right to sue for infringement ... in the licensee's own name." *Id.* at 1551-52 (citing *Waterman,* 138 U.S. at 255).

**\*4** Beyond assignees, only exclusive licensees have a rightful place in patent infringement suits. "To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well." *Id.* at 1552 (citing *Indep. Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 468-69 (1926)). Specifically, an exclusive licensee owns the right to exclude others from making, using, or selling the patented invention in a particular territory of the United States. *Ortho Pharm.,* 52 F.3d at 1032. A patent license that simply transfers some of the proprietary rights from the patentee to the licensee is a nonexclusive or bare license, which does no more than protect the licensee from an infringement suit by the patentee. *See id.* at 1032. The use of the word "exclusive" in a license agreement does not control the inquiry whether the license is exclusive; what matters is the intent of the parties and the substance of their agreement. *Textile Prods., Inc. v. Mead Corp.,* 134 F.3d 1481, 1484 (Fed.Cir.1998).

### 1

The court holds that Aspex is not an assignee of the '207 patent and therefore does not have standing to sue E'Lite in its own name. In its response to E'Lite's motion, Aspex refers to itself as "an 'exclusive' licensee with standing to sue in its own name." As discussed *supra,* an exclusive licensee can sue as a coplaintiff with the patentee, but only an assignee with all significant rights under the patent has standing to sue in its own name. Aspex does not possess all significant rights under the '207 patent.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

Page 4

Under Chic's agreement with the patentee Contour, Contour retains the right to "take appropriate enforcement actions" against any potential infringers if Chic does not due so within 30 days notice of potential infringement. P. Standing App. 23. Aspex thus "does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue." *Abbott Labs. v. Diamedix Corp.,* 47 F.3d 1128, 1132 (Fed.Cir.1995) (holding right to indulge infringements to be significant right and therefore indication there was no assignment). [FN2] This retained right is of the sort commonly held sufficient to make a patentee who grants an exclusive license a necessary party to an infringement action brought by the licensee. *See, e.g., Grantham v. McGraw-Edison Co.,* 444 F.2d 210, 213-16 (7th Cir.1971) (holding that licensing patentee retained right to sue infringers if licensee refused to do so); *Erbamont, Inc. v. Cetus Corp.,* 720 F.Supp. 387, 392-96 (D.Del.1989) (same).

FN2. The Federal Circuit distinguished *Abbott Laboratories* in *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245 (Fed.Cir.2000) . In *Speedplay* the court held that the patentee's "right to sue an infringer if Speedplay does not is illusory, because Speedplay can render that right nugatory by granting the alleged infringer a royalty-free sublicense. Although the licensee in Abbott could grant sublicenses, its right to do so was not unfettered, because it was liable for annual royalties on the sales of the sublicensees." *Id* . at 1251. In the instant case, the agreement between Contour and Contour allows Chic to grant royalty-free sublicenses such as the one it granted Aspex, but that right is limited by the provision "that [Chic] shall be responsible for the operations of its sublicensees relevant to this Agreement as if such operations were carried out by [Chic]." P. Standing App. 19. Contour could argue that this limitation prevents Chic from granting a sublicense to any and all potential infringers, because such grants could be construed as violating Chic's obligations under the "Notice and Enforcement of Infringement" section of its agreement with Contour. This potentially valid interpretation of the

agreement, which, if accepted by a court, would not render nugatory Contour's right to sue an infringer, indicates that Contour retains a significant interest in the '207 patent in a manner that could hinder Chic's full enjoyment of its patent rights. Moreover, even if Chic could legally grant a sublicense to any potential infringer, Contour would still maintain the right to sue that infringer for damages caused during the period from the beginning of the infringement to the granting by Chic of a sublicense to the infringer, since there is no provision in the agreement between Contour and Chic allowing Chic retroactively to take away Contour's right to sue by granting sublicenses. The *Speedplay* holding thus does not provide a rationale for considering Aspex an assignee with all significant rights in the '207 patent.

Contour additionally retains the right to pay up to 50% of litigation costs against any potential infringers and therefore to recover a pro rata share of any proceeds received. *See* P. Standing App. 23. This, too, constitutes a significant right. *See Abbott Labs.,* 47 F.3d at 1132 (holding patentee's right to participate in suit brought by successor in interest to be indication there was no assignment). Because Contour has retained significant rights under the '207 patent, Aspex does not have a sufficient interest to sue on its own as the "patentee" entitled by 35 U.S.C. § 271 to judicial relief for infringement.

2

*5 The court concludes next that Aspex is an exclusive licensee of the '207 patent who has standing to sue for infringement as a coplaintiff. The two keys to an exclusive license are the right to practice the invention in a given territory and the patentee's promise that others will be excluded from practicing the invention within that territory. *Rite-Hite,* 56 F.3d at 1552. Under the terms of the license agreement between Contour and Chic, "[Contour] appoint[ed] [Chic] its exclusive licensee throughout the Territory to make, use, import, sell and distribute frames covered by the claims in the [ '207 patent]." P. Standing App. 18-19. Moreover, Contour agreed to "[t]ake all necessary steps to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                          Page 5
(Cite as: 2002 WL 1751381 (N.D.Tex.))

ensure that none of [its] other distributors sell any Frames in the Territory." *Id* . at 21. Because they provide for the two key rights associated with exclusive licensees, the specific terms of the license agreement between Contour and Chic indicate their intent that Chic serve as Contour's exclusive licensee in the United States, with the standing necessary to sue for patent infringement.

There are other provisions in the Contour-Chic license agreement that support Chic's status as an exclusive licensee. Contour granted Chic the right to sublicense the '207 patent, *see id.* at 19, which is a factor that weighs strongly in favor of finding that Chic thereby acquired significant proprietary rights in the '207 patent. *See, e.g., Prima Tek II, L.L.C. v. A-Roo Co.,* 222 F.3d 1372, 1380 (Fed.Cir.2000); *Zenith Elec. Corp. v. ExZec Inc.,* 876 F.Supp. 175, 179 (N.D.Ill.1995). Contour also granted Chic the right to enforce the '207 patent against infringers, *see* P. Standing App. 22, which is "particularly dispositive" of the standing issue, *Vaupel Textilmaschinen KG,* 944 F.2d at 875. Because Chic received proprietary rights in the '207 patent beyond a covenant not to be sued for infringement when practicing the invention, Contour made Chic the exclusive licensee of the '207 patent.

Aspex is, in turn, Chic's exclusive sublicensee by virtue of their March 26, 1998 agreement. Chic granted Aspex "an exclusive license to make, use, sell, or have made any products" under the '207 patent. P. Standing App. 31. Chic cannot make, use, sell, or have made in the United States any products under the '207 patent without Aspex's express authorization. *Id.* Chic also transferred to Aspex the exclusive right to enforce the '207 patent in the United States, even against Chic. *Id.* at 32-33. Chic has thus transferred its significant proprietary rights in the '207 patent to Aspex, who as sublicensee steps into Chic's shoes as exclusive licensee for purposes of determining standing. The fact that an exclusive sublicensee derives interest in the patent through an intermediate exclusive licensee does not affect the exclusive sublicensee's status as a party with the proprietary right to exclude. *See Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 651-52 (Fed.Cir.1985) (holding patentee, exclusive licensee, and exclusive sublicensee have joint standing to sue for infringement).

*6 In denying the intent of Contour and Chic and,

by implication, of Chic and Aspex shortly thereafter, to create an exclusive license arrangement, E'Lite points to two examples of subsequent practice among the parties to this series of agreements that it contends conflict with the interpretation that Aspex possesses the proprietary rights in the '207 patent necessary for standing to sue.

First, E'Lite argues that "Contour exercised continued ownership control in granting MDS a limited license in December 1999, long after the time plaintiff claims exclusive rights." D. Standing Br. 5. The December 1999 arbitration settlement agreement between Contour and MDS expressly prevents MDS from "[s]tating, suggesting, implying or otherwise communicating, either directly or indirectly, to any third party that [it] has any rights under [the '207 patent], except insofar as may be expressly authorized in writing in any agreement between Contour and Pentax[.]" D. Standing App. 50. The settlement prevents MDS from "[m]aking, using, selling, offering for sale, distributing or importing into the United States any top-mounted magnetic optical frames other than Pentax brand name frames, except insofar as a court or administrative agency of competent jurisdiction may hereafter determine otherwise[.]" *Id.* These two provisions indicate that Contour was not granting MDS a limited license in the '207 patent. Rather, it was ensuring that MDS agreed not to infringe the patent while recognizing that the ongoing dispute between certain Contour patents and certain Pentax patents could result in a mutual resolution wherein MDS would retroactively obtain limited rights in the '207 patent. In any case, the December 1999 agreement prevents MDS from practicing the invention at all, limited only by a potential future agreement between Contour and Pentax. Because that limitation had no effect as of the arbitration settlement agreement itself, Contour did not grant MDS a limited license in the '207 patent in December 1999 and thereby exercise proprietary rights in that patent.

Second, E'Lite contends that Aspex lacks standing as an exclusive licensee because Contour assigned co-ownership rights in the '207 patent to Pentax in May 2000. Contour and Pentax entered into their agreement because there had been an ongoing dispute between the two companies concerning which one had the right to practice certain inventions in certain parts of the world. There was

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 1751381 (N.D.Tex.))**

Page 6

an interference proceeding before the PTO Board of Appeals concerning the ' 207 patent and a Pentax patent application. *See* P. Standing App. 95. Before the proceeding was resolved, Contour and Pentax agreed that they would co-own the invention embodied in both. *See id.* They ultimately decided to co-own the Contour patent and abandon the Pentax application. *See id.* Because this decision resulted in Contour's assigning a one-half undivided interest in the '207 patent to Pentax, subject not only to Contour's exclusive license agreement with Aspex but also to an exclusive license agreement in the abandoned Pentax application between Pentax and MDS, E'Lite argues that Contour still possessed significant proprietary rights in the '207 patent as of May 2000 and that Aspex is therefore not an exclusive licensee with standing to sue for infringement.

*7 The May 2000 agreement does not necessarily indicate, however, that Contour and Chic did not intend to create an exclusive licensing arrangement in March 1998. E'Lite's specific position is that Contour's actions in negotiating the agreement with Pentax, and Aspex's failure to object to it, are indicative, as subsequent practice, that Chic was not intended to be an exclusive licensee. There is a way, however, for the court to read the May 2000 agreement between Contour and Pentax that would harmonize it with the intent of Contour and Chic to create an exclusive license arrangement in their earlier agreement. After March 1998, Aspex cared about the value of its exclusive license in the '207 patent. At the same time, Contour and Pentax were involved in an interference proceeding that could have resulted in the '207 patent's being superseded by Pentax's similar patent. When Contour and Pentax agreed to be retroactive co- patentees of the winning patent in the interference proceeding, Aspex had an interest in allowing such an arrangement because the alternative was the risk that its exclusive license in the '207 patent could be rendered meaningless by an adverse ruling by the Board of Appeals. Under this plausible interpretation, the May 2000 agreement protected Aspex's interest in the value of its exclusive license; it did not indicate the lack of such a proprietary interest.

Moreover, even if the May 2000 agreement between Contour and Pentax, and Aspex's apparent acquiescence in it, contradicts the terms of the earlier agreement between Contour and Chic that

clearly grants Chic an exclusive license in the '207 patent, that fact does not strip Aspex of its rights as an exclusive licensee and of its standing in this case. There are a host of reasons, such as the risk determination discussed *supra,* that could have motivated Aspex to acquiesce in Contour's negotiations and ultimate resolution with Pentax. In determining whether Aspex has made a *prima facie* case for standing, it would be inappropriate for the court to reach the merits as to those reasons. Aspex has met its *prima facie* burden by providing a series of agreements among Contour, Chic, and itself that clearly establishes the intent of the parties to make Aspex the exclusive licensee of the '207 patent. The fact that Contour may have violated the agreements at a later date by assigning rights in the patent to Pentax does not change the fact that Aspex legally obtained those rights in March 1998 and may attempt to vindicate them in an infringement suit against E'Lite.

Because the terms of the agreements among Contour, Chic, and Aspex in the spring of 1998 clearly indicate the parties' intent to make Aspex the exclusive licensee in the United States of the '207 patent, and because E'Lite has not pointed to any significant exclusionary rights intended to be retained by Contour that contravene Aspex's exclusive licensing arrangement, the court holds that Aspex has coplaintiff standing to sue for patent infringement and denies E'Lite's motion to dismiss for lack of standing.

### III

*8 Aspex moves to join any additional parties needed for a just adjudication. [FN3] Specifically, Aspex requests that the court join Contour, Pentax, and MDS [FN4] if it determines they are necessary within the meaning of Fed.R.Civ.P. 19 and 21.

> FN3. E'Lite has filed a motion on both procedural and evidentiary grounds to strike certain parts of Aspex's appendix to its motion. Because the court did not rely on any evidence in Aspex's appendix to its motion to join additional parties in deciding the motion, E'Lite's motion to strike is denied as moot.

> FN4. Aspex refers to MDS in its motion by

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                       Page 7
(Cite as: 2002 WL 1751381 (N.D.Tex.))

the shorthand term "Lerner." *See, e.g.,* P. Mot. Join Add'l Parties at 3.

Because the court has determined that Aspex has standing to sue as a coplaintiff with the patentee of the '207 patent, and because under the assignment executed in the May 2000 agreement between Contour and Pentax both companies co-own the patent, the court orders that they should be joined as additional parties. Under the terms of the May 2000 agreement, MDS retains an exclusive license to practice the '207 patent invention under the Pentax brand. Accordingly, the court holds that MDS "claims an interest relating to the subject of the action and is so situated that the disposition of the action in [its] absence may ... impair or impede [its] ability to protect that interest," Rule 19(a), and orders that MDS be joined.

E'Lite objects to Aspex's motion, contending it has not made an adequate showing under Rule 19, the motion is untimely, Aspex must have standing to enforce the '207 patent in order for the entire case not to be dismissed, and it will be prejudiced if this relief is granted. The court disagrees. Under Rule 21, the court may join additional parties on "its own initiative at any stage of the action." Moreover, for E'Lite's timeliness argument to have merit, it must demonstrate that it will incur a hardship if the motion is granted and the three additional parties are added. E'Lite's argument in this regard is too general and conclusory, *see* D. Resp. Mot. Join Add'l Parties at 8-9, and it therefore has not made the required showing. [FN5] Finally, the court has already determined that Aspex has coplaintiff standing to sue for infringement. Because this determination requires joining Contour and Pentax as co-owners of the '207 patent, and since the court holds that MDS is a necessary party, the court grants the motion and orders all three parties joined in this action.

> FN5. Aspex does not oppose E'Lite's conducting limited discovery regarding additional parties, provided it can demonstrate a genuine need to do so. *See* P. Mot. Join Add'l Parties at 2. Accordingly, if the parties cannot resolve this issue by agreement, E'Lite may move to take discovery that is necessary by reason of the addition of these parties.

IV

E'Lite moves for partial summary judgment as to its invalidity counterclaim and affirmative defense. It contends the '207 patent is invalid because it is anticipated by and obvious from prior inventions. E'Lite argues that any '207 patent claims covering back-mounted eyewear design are invalid because the patentee did not invent the back-mounted design; rather, such a design was anticipated by an earlier patent. It also contends the invention covered by the '207 patent is obvious to a person of ordinary relevant skill at the time of invention in that it was contemporaneously made by Rony Ovadia ("Ovadia"), Julie Madison ("Madison"), Toshikayu Iwamoto ("Iwamoto"), David Chao ("D.Chao"), and R. Chao. Aspex responds that E'Lite has failed to produce clear and convincing evidence of either anticipation or obviousness.

A

A patent enjoys a presumption of validity. *See* 35 U.S.C. § 282; *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed.Cir.1986). This presumption can be overcome only if the party seeking to invalidate the patent meets its burden of establishing invalidity by clear and convincing evidence. *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 962 (Fed.Cir.2001). Because E'Lite will have the burden of proof at trial on its invalidity counterclaim and affirmative defense, to obtain summary judgment it "must establish 'beyond peradventure all of the essential elements of the claim or defense." ' *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.,* 878 F.Supp. 943, 962 (N.D.Tex.1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir.1986)).

B

\*9 Before turning to the merits of E'Lite's invalidity argument, the court must address a procedural issue that significantly impacts the resolution of this part of E'Lite's motion for partial summary judgment. N.D. Tex. Civ. R. 56.5(a) requires that the motion "be accompanied by a brief that sets forth the argument and authorities on which the party relies[.]" Rule 56.6(a) states that "[a] party who relies on affidavits, depositions, answers to interrogatories, or admissions on file to support or oppose a motion for summary judgment must

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

include such evidence in an appendix." Rule 56.5(c) provides that "[a] party whose motion or response is accompanied by an appendix must include in its brief citations to each page of the appendix that supports each assertion that the party makes concerning the summary judgment evidence." E'Lite supports its arguments with global citations to various tabs in its appendix rather than to particular supporting evidence on specific pages of the appendix. *See, e.g.,* D. MPSJ Br. at 7, 8, 9.

The court in deciding E'Lite's motion will not take into account summary judgment evidence that E'Lite has not cited in the manner required--that is, to each page of the appendix that supports each assertion that the party makes concerning the evidence. "Otherwise, [Rule 56.5(c) ] would not mean what [it] say[s]." *See Andrews v. CompUSA, Inc.,* 2002 WL 265089, at *3 (N.D.Tex. Feb. 21, 2002)( Fitzwater, J.). The court will not undertake a search of the appendix for evidence that would be sufficient to grant summary judgment in E'Lite's favor. The court is not required to "comb the record" in search of summary judgment evidence. *See Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 463 (5th Cir.1996) (citing *Jones v. Sheehan, Young & Culp, P.C.,* 82 F.3d 1334, 1338 (5th Cir.1996)). "Nor will the court overlook Rule 56.5(c), a valuable tool for busy trial courts that requires a party to place an issue clearly in focus by citing in its brief *each* page of the appendix that supports *each* assertion that it makes concerning the summary judgment evidence." *Andrews,* 2002 WL 265089 at *3. Moreover, the court will not consider arguments supported for the first time with specific evidence in a movant's reply brief, because in doing so the court would be considering summary judgment on a ground not raised in the motion. *See John Deere Co. v. Am. Nat'l Bank, Stafford,* 809 F.2d 1190, 1192 (5th Cir.1987) (holding that it is error for court to grant summary judgment on ground not properly raised); *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC,* 749 F.Supp. 758, 772 (N.D.Tex.1990) (Fitzwater, J.) (holding that court will not consider on summary judgment a new argument raised in a reply brief). "If the court disregards or "relaxes" the rules in this case, on what principled basis could it apply them again or justify why it has enforced them literally in prior cases?" *Andrews,* 2002 WL 265089 at *3. Therefore, to establish the elements of its invalidity counterclaim "beyond peradventure," E'Lite must, with the requisite

specificity, cite in the brief accompanying its motion for partial summary judgment relevant evidence from its appendix.

C

**\*10** E'Lite's anticipation argument--that the '207 patent claims covering back-mounted designs are invalid because Contour represented to the PTO that such designs were not in fact protected by the patent--fails in that it does not shift the burden to Aspex to respond. 35 U.S.C. § 101 requires that, to obtain a patent, the applicant be the first inventor. Additionally, 35 U.S.C. § 102 provides that a person shall not be entitled to a patent unless:

(f) he did not himself invent the subject matter sought to be patented, or

(g)(1) during the course of an interference conducted under section 135 or section 291, another inventor involved therein establishes, to the extent permitted in section 104, that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed, or (2) before such person's invention thereof the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it[.]

E'Lite makes no effort to indicate which of these statutory provisions the '207 patent violates, nor does it attempt to establish each element of a violation of one of them. Rather, E'Lite's argument is constructed as a series of assertions about D. Chao's relationship with Contour and his testimony at a PTO hearing. The only citations E'Lite offers as evidence of these assertions are to "Appendix Tabs" G and I. *See* D. MPSJ Br. at 7. Tab G contains the entire record of a February 24, 1999 PTO interference hearing between R. Chao and Iwamoto, and tab I contains the entire U .S. Patent No. 6,109,747 ("the '747 patent") for eyeglass frames with magnets in flanges. Because E'Lite does not tie the assertions it makes to the elements of an invalidity claim based on anticipation, and because it does not even make an effort to cite specific pages in its appendix that provide support for the assertions it makes in its argument, it has failed to raise an argument to which Aspex must respond, and summary judgment is inappropriate.

D

E'Lite's obviousness argument--that Ovadia, Madison, Iwamoto, R. Chao, and D. Chao simultaneously invented the invention covered by

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

the '207 patent--also fails and does not shift the burden to Aspex to respond. 35 U.S.C. § 103(a) provides:

An invention may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains[.]

E'Lite undertakes no attempt to link the assertions it makes about the work of Ovadia, Madison, and Iwamoto to the elements of invalidity based on obviousness set out in this statute. Moreover, it fails to cite properly evidence for the assertions it does advance. In discussing Ovadia's work, E'Lite makes specific assertions as to the timing and nature of the work, but cites only to appendix tab J, *see id.* at 8, which contains several pages of Ovadia's deposition testimony. In discussing Madison's work, E'Lite offers her testimony that she invented both top-mounted and back-mounted eyewear designed at a particular time, but cites to the entirety of appendix tabs K and L. *See id.* at 9. Tab K contains a large portion of Madison's deposition testimony, and tab L is the entire patent for her invention. In discussing Iwamoto's work, E'Lite fails to cite supporting evidence for its assertions. *See id.* Because E'Lite does not tie the assertions it makes to the elements of an invalidity claim based on obviousness, and because it does not cite specific pages in its appendix that provide support for the specific assertions it makes in its argument, it has failed to raise an argument to which Aspex must respond, and summary judgment is unwarranted.

*11 E'Lite has not established "beyond peradventure" the essential elements of anticipation or obviousness. The court therefore denies E'Lite summary judgment on its invalidity counterclaim and affirmative defense.

### V

E'Lite also moves for partial summary judgment as to Aspex's patent infringement claims.

### A

In considering E'Lite's motion, the court must first construe the meaning of certain key claims. [FN6]

Claim construction is a matter of law, and claims are construed by the court as they would be understood by persons of ordinary skill in the field of the invention. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370 (1996). The court starts with the claim itself, read in light of the specification. *See Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.,* 200 F.3d 795, 804 (Fed.Cir.1999). Using these tools, the court construes only the claims that are in controversy, and only to the extent necessary to resolve the dispute. *Id.* at 803.

> FN6. A *Markman* hearing is unnecessary in this case. *See Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996), *aff'g Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc). In some patent cases, a claim construction hearing allows the court to question and evaluate attorney argument and/or witness testimony regarding the competing claim constructions. This process may be helpful when the claims are ambiguous or the technology is complex. Nothing, however, mandates the use of a *Markman* hearing in every patent case. Courts retain the discretion to construe the claims on the basis of a paper record alone. *See Interactive Gift Express, Inc., v. Compuserve Inc.,* 1998 WL 247485, at * 1 n. 3 (S.D.N.Y. May 15, 1998) ("The court notes at the outset that no *Markman* hearing is needed in this case because the court does not require expert or other testimony to aid it in its claim construction."). In a case such as the present one, where the technology is accessible to the court and the claims are relatively straightforward, a *Markman* hearing is unnecessary.

The '207 patent has two claims. Claim 1 is an independent claim and states:
An eyeglass device comprising:
a primary spectacle frame for supporting primary lenses therein, said primary spectacle frame including two side portions each having an extension extended therefrom for pivotally coupling a leg means thereto, said primary spectacle frame including two rear and side

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

portions each having a projection secured thereto, said primary spectacle frame including an upper side portion,

a pair of first magnetic members secured in said projections respectively,

an auxiliary spectacle frame for supporting auxiliary lenses therein, said auxiliary spectacle frame including two side portions each having an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame, and

a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary frame to said primary spectacle frame,

said arms being engaged with and supported on said upper side portion of said primary spectacle frame so as to allow said auxiliary spectacle frame to be stably supported on said primary spectacle frame and so as to prevent said auxiliary spectacle frame from moving downward relative to said primary spectacle frame and so as to prevent said auxiliary spectacle frame from being disengaged from said primary spectacle frame.

D. MPSJ App. 5. Claim 2 is a dependent claim and includes limitations on claim 1, stating:

An eyeglass device according to claim 1, wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame, and second magnetic members are extended downward toward said projections for hooking on said primary spectacle frame so as to further secure said auxiliary spectacle frame to said primary spectacle frame.

*12 *Id.*

In addition to the claim language, the prosecution history is "often helpful in understanding the intended meaning as well as the scope of technical terms." *Vivid Techs.*, 200 F.3d at 804. The prosecution history includes the record of interference proceedings. *See Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 872 (Fed.Cir.1998). In particular, the prosecution history is relevant in determining whether the patentee intends the language of the patent to be understood in its ordinary meaning.

Although a court should generally give the terms of a patent their ordinary meaning, "a patentee may

choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). When this intrinsic evidence unambiguously describes the scope of a patented invention, reliance on extrinsic evidence is improper. *See id.* at 1583. Extrinsic evidence, including expert testimony, "is not to be relied upon for purposes of claim construction, other than to aid the judge in understanding the technology[.]" *EMI Group N. Am., Inc. v. Intel Corp.*, 157 F.3d 887, 892 (Fed.Cir.1998). In the present case, where the technology involved is uncomplicated and the claims are unambiguous, expert testimony is not needed.

B

E'Lite interprets the '207 patent claims to require that (1) the term "projection" refers to an area behind the frame that receives and holds the magnet; (2) the term "upper side portion of said primary frame" does not refer to the upper side of the projection; and (3) the term "arm" means an arm that is substantially straight and does not extend below the projection. Aspex contends that (1) the "projection" is part of the primary spectacle frame; (2) the term "upper side portion" of the primary spectacle frame includes the top side of the projection; and (3) the "arm" is not limited to being substantially straight or being above the projection.

1

E'Lite argues that the '207 patent claims limit the meaning of "projection" to the area behind the frame that receives and holds the magnet. Aspex contends the projection is part of the primary spectacle frame. To support its argument, E'Lite cites tab A of its appendix, which is simply the entire '207 patent. E'Lite neither specifies language in the patent nor explains specifically how any of the patent language--whether in the claims themselves or the specification--favors its interpretation of the term. The general citation is insufficient because it does not assist the court in its claim construction analysis. E'Lite cites no prosecution history to support its interpretation.

Aspex points the court to the claim language and to the specification as evidence supporting its

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

Page 11

construction of the meaning of the term "projection." Claim 1 includes the limitation "said primary spectacle frame including two rear and side portions each having a projection secured thereto[.]" D. MPSJ App. 5. The plain language of this limitation favors Aspex's construction that the extensions, projections, and magnetic members are part of the primary spectacle frame. The specification, by stating plainly and directly that the primary spectacle frame includes the projections, provides even clearer evidence favoring such a construction: "The primary spectacle frame 10 *includes two projections* 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein." *Id.* at 4 (emphasis added). The court may consider the specification in interpreting the claim, *see Vivid Techs.,* 200 F.3d at 804, and therefore construes the term "projections" to be part of the primary spectacle frame.

2

*13 E'Lite asserts that the "upper side portion" of the primary spectacle frame does not refer to the upper side of the projections. Aspex posits that the term does include the top side of the projections.

E'Lite again cites only tab A of its appendix and does not offer into evidence any of the patent prosecution history favoring its proposed construction. Aspex points to the claim language and to the specification as evidence supporting its proposed construction. The '207 patent claims an auxiliary spectacle frame "including two side portions each having an arm extended therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame[.]" *Id.* at 5. In other words, whatever the auxiliary frame engages with is defined as part of the upper side portion of the primary frame. The patent also claims "a pair of second magnetic members secured to said arms respectively for engaging with said first magnetic members of said primary spectacle frame so as to secure said auxiliary spectacle frame to said primary spectacle frame[.]" *Id.* This means that the first magnetic members are the point of engagement between the auxiliary and primary frames. Reading these two cited portions of claim 1 together, it is clear that the first magnetic members are part of the upper side portion of the primary spectacle frame. Because the magnetic members are in the projections, *see id.* at 4 ("The primary spectacle frame 10 includes two projections 13 secured to the

rear and side portions thereof for supporting magnetic members 14 therein."), the projections are also part of the upper side portion of the primary spectacle frame.

E'Lite argues in its reply brief that Aspex's proposed construction "does not take into account the plain language of the claim, the description of the primary frame and projections as described in the specification, nor Claim 2." D. MPSJ Rep. at 3. The court disagrees. The specification language also supports Aspex's construction. It states that "[t]he primary spectacle frame 10 includes two projections 13 secured to the rear and side portions thereof for supporting magnetic members 14 therein." D. MPSJ App. 4. It also states that the auxiliary spectacle frame contains two arms "for extending over and for engaging with the upper portion of the primary spectacle frame 10." *Id.* Because the magnetic members are the point of engagement with the upper portion of the primary frame, and since the magnetic members are secured within the projections, the projections are part of the upper, or upper side, portion.

The language of claim 2 does not contradict Aspex's proposed construction. Because claim 2 refers to an eyeglass device "wherein said projections and said first magnetic members are arranged lower than said upper side portion of said primary spectacle frame," *id.* at 5, E'Lite appears to contend that the projections and the upper side portion are distinct and that the former are not part of the latter. But claim 2 simply refers to an eyeglass device wherein the auxiliary spectacle frame attaches to the primary spectacle frame at a lower point on the back of the primary frame "for hooking ... so as to further secure said auxiliary spectacle frame to said primary spectacle frame." *Id.* For this hooking effect to be accomplished, the two frames must engage at a lower point than that described in claim 1. It is this lower point of engagement that the language of claim 2 attempts to describe. Even though the claim uses the language "lower *than* said upper side portion" (emphasis added) rather than "lower *on* said upper side portion" (emphasis added), it is not essential to the meaning or purpose of claim 2 that the point of engagement be defined as below the upper side portion of the primary frame. The use of the word "than" rather than "on" does not change the meaning of claim 2. Therefore, it need not be read to contradict the clear language of claim 1 and the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

specification defining the projections as part of the upper side portion of the primary spectacle frame. The court construes the term "upper side portion" of the primary spectacle frame to include the upper side of the projections.

3

*14 E'Lite asserts that the '207 patent claims "arms" that are substantially straight and do not extend below the projections. Aspex contends the arms are not limited either to being substantially straight or to being situated above the projections.

E'Lite first cites generally to tabs A, B, and C of its appendix. As the court has already explained, it will not "comb the record" in search of support for E'Lite's proposed construction. *See Doddy,* 101 F.3d at 463 (citing *Jones,* 82 F.3d at 1338). More specifically, E'Lite cites an incident from the prosecution history of the '207 patent in which the patent examiner rejected the addition of a "Figure 8" as not being supported by the specification and as new matter. The proposed addition contained a downward extension, at a right angle, from the arm of the auxiliary spectacle frame past the top of both the projection and extension on the primary spectacle frame. *See* D. MPSJ App. 20. This proposal for Figure 8 was rejected, and the one that was ultimately accepted was substantially the same, except that the downward extension from the arm of the auxiliary spectacle frame was removed. *See id.* E'Lite cites the acceptance of the revised Figure 8 as evidence that the arms of the auxiliary spectacle frame must be substantially straight and not extend below the primary spectacle frame's projections.

The court rejects this interpretation of the prosecution history evidence. As Aspex points out, the downward extension depicted in the rejected Figure 8 is not necessarily part of the arm, as defined by the patent. Rather, it seems to be an additional flange component extending downward, at a right angle, from the arm. Its rejection means that the term "arms" cannot include such a flange component, but it does not mean that the arms must be straight or that they cannot extend below the projections. The prosecution history that E'Lite cites does not establish such a limitation.

The claim language itself also fails to establish such a limitation. Claim 1 refers to an auxiliary spectacle frame that includes "an arm extended

therefrom for extending over and for engaging with said upper side portion of said primary spectacle frame[.]" *Id.* at 5. This language does not limit the manner in which the arm may engage with the primary spectacle frame in a way that would prevent the arm from extending below the primary frame's projections. Nor is there language in the specification that would permit the court to construe such a limitation. In fact, the specification states that "the arms 21 and the magnetic members 22 may *hook on* the primary spectacle frame 10[ ] such that the auxiliary spectacle frame 20 may further be stably supported and secured to the primary spectacle frame 10." *Id.* (emphasis added). For one object to "hook" onto another object, it usually requires that the hooking object not be substantially straight and that it wrap around or below the object to which it is being hooked. Because the claim language offers no evidence of the appropriateness of the limitation that E'Lite urges--that the arms must be substantially straight and not extend below the projections-- and because the specification language at best suggests the opposite, the court declines to construe the claim as having such a limitation.

*15 Having construed the claims necessary to resolve E'Lite's motion for partial summary judgment, the court now turns to the merits of the motion.

C

E'Lite moves for partial summary judgment that its Smart Clip models of eyeglasses do not infringe either claim of the '207 patent. It maintains that (1) the arm portions of the auxiliary frame do not rest upon the upper side portion of the primary frame; (2) during its inspection process, E'Lite ensures that the arm portion does not touch the upper side portion of the primary frame; (3) the magnetic force is the only force that holds the auxiliary frame of the Smart Clip models in the proper position relative to the primary frame; (4) the magnets in the Smart Clip design are designed so that they mate in a plane substantially parallel to the plane of the lenses, and the eyeglasses are of the back-mounted style; (5) Smart Clip models do not literally infringe claim 1 of the patent because they do not have arms that rest upon the upper side portion of the primary frame and do not have arms that extend below the projections; (6) Smart Clip models do not literally infringe claim 2 of the patent because they do not

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d

(Cite as: 2002 WL 1751381 (N.D.Tex.))

literally infringe claim 1, on which claim 2 is dependent; (7) Smart Clip models do not literally infringe claim 2 because the claim requires that the projections be lower than the upper side portion of the primary frame and Smart Clip models do not have projections lower than the upper side portion of the primary frame; (8) Aspex is estopped from asserting that Smart Clip models literally infringe either claim based on representations made to the PTO during an interference proceeding that the patent does not cover a back-mounted design; (9) the doctrine of equivalents is not applicable because the examiner required, and the inventor consented to, an amendment to both claims inserting the word "side" between the words "upper" and "portion," and no range of equivalents can be asserted for the language; (10) because the Smart Clip models do not have arms touching the upper side portion of the primary frame, the doctrine of equivalents is not applicable because touching at other locations cannot be equivalent; (11) estoppel prevents application of the doctrine of equivalents to the Smart Clip models; and (12) if the doctrine of equivalents can apply, the Smart Clip models are not equivalent because the arms do not rest on the upper side portions of the primary spectacle frame and there is thus no structure that provides an equivalent to that limitation and the corresponding function, preventing the auxiliary frame from moving relative to the primary frame. [FN7]

> FN7. Aspex also alleges in its complaint that E'Lite's Mac Eye models infringe claim 1 both literally and under the doctrine of equivalents. Because E'Lite does not move for summary judgment as to the Mac Eye models, the court need not address whether they infringe the '207 patent.

1

E'Lite's arguments relying on its own design and inspection procedures as proof that there is no literal infringement, and asserting that Aspex is estopped from alleging both literal infringement and infringement under the doctrine of equivalents, are inadequate. For its proof as to key assertions supporting the design and inspection argument, E'Lite cites generally to tabs E and F of its appendix. *See* D. MPSJ Br. at 4. For its proof as to

essential allegations supporting the estoppel argument, it cites generally to the interference file in the PTO and tab G of its appendix. *Id.* at 5. It states that the interference file is "not included here due to being *too voluminous." Id.* (emphasis added). The court will not search the record for evidence that E'Lite should have cited specifically concerning design and inspection or estoppel. Because E'Lite as the movant has failed to present evidence supporting its assertions, the burden has not shifted to Aspex to respond to either argument. Summary judgment on each of these grounds is denied.

2

*16 The court now turns to E'Lite's remaining arguments to support its contention that the Smart Clip models do not infringe. When the summary judgment movant will not have the burden at trial concerning a cause of action, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support the claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the party does so, the nonmovant must then go beyond its pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1995) (en banc) (per curiam). Moreover, the summary judgment nonmovant must produce evidence to establish the existence of each element for which it bears the burden of proof. *See Dunn v. State Farm Fire & Cas. Co.,* 927 F.2d 869, 872 (5th Cir.1991). Summary judgment is mandatory where the nonmoving party fails to meet this burden. *Little,* 37 F.3d at 1076. The nonmovant's failure to adduce proof as to any essential element renders all other facts immaterial. *Celotex Corp.,* 477 U.S. at 323.

E'Lite argues that Aspex lacks evidence of two limitations in claim 1. One supposed element--that the arms portions of the auxiliary frames must not extend below the projections--is not in fact present in the claim. *See supra* § V(B)(3). As to the second limitation--that the arms must rest on the upper side portion of the spectacle frame--Aspex has adduced sufficient evidence to allow a reasonable trier of fact to conclude that the Smart Clip models infringe the patent. Plaintiff's expert, Dr. Arun Kumar ("Dr.Kumar"), [FN8] examined six Smart Clip models from the Smart Clip 200-model series and concluded that each of them "revealed touching of the arm of the auxiliary frame (clip-on) at the rear

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

corner of the upper side portion of the primary frame. The contact was between the inner radius of the arm of the auxiliary frame and the rear corner of the upper side portion of the primary frame." P. MPSJ App. 567. [FN9] Dr. Kumar reached the same conclusion after examining six other 200-model series devices and an 800-model series device. *See id.* at 568. A drawing that accompanies Dr. Kumar's report shows that what he refers to as the "upper side portion of the primary frame" comports with the court's construction of that term. *See supra* § V(B)(2). This is so because the point of contact in all the Smart Clip models examined is between magnets on the auxiliary and primary spectacle frames. *See* P. MPSJ App. 569. The court has determined that the magnets secured to the projections are part of the upper side portion of the primary spectacle frame. *See supra* § V(B)(2). Dr. Kumar's expert opinion thus constitutes sufficient evidence from which a reasonable trier of fact could find that the Smart Clip 200 and 800-model series contain arms that rest on the upper side portion of the primary spectacle frame.

> FN8. Although E'Lite has moved to strike Dr. Kumar's testimony, the court denies the motion *infra* at § IX(C).

> FN9. Aspex did not file an appendix in support of its response to E'Lite's motion for partial summary judgment. Instead, it adopted the appendix it filed in support of its own motion for partial summary judgment. *See* P. MPSJ Resp. Br. at 4. Although this practice does not comply literally with the local civil rules, the court has allowed it where the citations in the party's brief contain the required specificity prescribed by Rule 56.5(c). *See Andrews,* 2002 WL 265089, at *3 ("To the extent that [plaintiff] has cited evidence in his own appendix in the manner required by Rule 56.5(c), the court will consider that proof in determining whether there is a genuine issue of material fact as to [defendant's] intent to create a binding compensation contract."). Accordingly, in deciding E'Lite's motion, the court will consider evidence in that appendix that Aspex cites with the required specificity.

**\*17** E'Lite's expert, David L. Hitchcock, Esquire ("Hitchcock"), [FN10] has also provided evidence that would allow a reasonable trier of fact to draw this conclusion. He admitted under cross-examination that "[i]n some instances, there is contact between the inner radius of the arm [of the auxiliary spectacle frame] and the rear edge of the projection[.]" P. MPSJ App. 557. In other words, at least some of the Smart Clip models contain arms that rest on the projections, which are part of the upper side portion of the primary spectacle frame. Because E'Lite does not distinguish among the various Smart Clip model series, this general evidence provides a sufficient basis to deny summary judgment.

> FN10. Although Aspex has moved to strike Hitchcock's testimony, the court denies its motion *infra* at § X.

A reasonable trier of fact could find that E'Lite's Smart Clip eyeglasses have auxiliary spectacle frame arms that rest on the upper side portion of the primary spectacle frame. Summary judgment in E'Lite's favor as to literal infringement of claim 1 of the '207 patent is denied. [FN11]

> FN11. E'Lite's argument in its reply brief that the models Dr. Kumar, and presumably Hitchcock, examined were "mutilated, contorted, and otherwise handled by a substantial number of people, many of [whom] represent [Aspex,]" D. MPSJ Rep. Br. at 4, is insufficient to warrant summary judgment. E'Lite has produced no evidence of such mutilation and contortion, nor would it be proper for the court to rule on whether mutilation or contortion occurred, and whether its occurrence is relevant, at the summary judgment stage. This is a fact issue to be resolved at trial.

3

E'Lite argues that its accused devices do not literally infringe claim 2 of the '207 patent. It maintains that Aspex lacks evidence that the Smart Clip models' projections are lower than the upper

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

side portion of the primary frame. Aspex has neither responded to this contention nor does it appear to argue that any Smart Clip models infringe claim 2. The court therefore grants E'Lite's motion for partial summary judgment as to all claims that allege that Smart Clip eyeglasses literally infringe claim 2 of the patent.

E'Lite also moves for summary judgment as to infringement of claim 2 under the doctrine of equivalents. [FN12] It contends there is no range of equivalents that can be asserted in the case of the '207 patent, and, assuming *arguendo* that there is, the doctrine does not apply here. Both arguments rely on the assertion that because the arms of the Smart Clip models' auxiliary spectacle frame do not rest on the upper side portion of the primary spectacle, the Smart Clip models cannot be equivalents of inventions made under the '207 patent . *See* D. MPSJ Br. at 5-6. Because the court has determined that there is sufficient evidence for a reasonable trier of fact to conclude that the Smart Clip models' arms do touch the upper side portion of the primary spectacle frame, *see supra* § V(C)(2), the court rejects E'Lite's arguments and denies summary judgment as to infringement of claim 2 under the doctrine of equivalents.

FN12. Because the court denies E'Lite's motion for partial summary judgment as to literal infringement of claim 1, its arguments in favor of summary judgment as to infringement of claim 1 under the doctrine of equivalents are also denied. Because E'Lite posits the same arguments under the doctrine of equivalents as to claims 1 and 2, *see* D. MPSJ Br. at 5-6, the court's reasoning supporting denial of summary judgment as to infringement of claim 2 under the doctrine of equivalents would apply equally to claim 1.

4

The court grants E'Lite's motion for partial summary judgment as to any claims by Aspex alleging that E'Lite's Smart Clip models literally infringe claim 2 of the '207 patent. The remainder of E'Lite's motion is denied.

VI

The court now turns to Aspex's motion for partial summary judgment. Aspex moves for summary judgment as to E'Lite's counterclaim and affirmative defense of patent invalidity. It argues that E'Lite generally has failed to adduce evidence that would allow a reasonable trier of fact to find that the '207 patent is invalid, that E'Lite has failed to produce the required evidence as to four statutory bases of invalidity, and that specific evidence that E'Lite may attempt to cite as proof of any of these statutory bases is insufficient. E'Lite argues that the inventions of Ovadia, Madison, and Iwamoto are adequate evidence of anticipation and obviousness under the statutory bases of invalidity, that the interference proceeding between R. Chao and Iwamoto established Iwamoto as the senior party in interest and therefore is sufficient proof of the invalidity of the '207 patent, that certain prior art references show obviousness, and that key terms in the '207 patent claims are unclear and vague and therefore render the patent invalid.

A

*18 The court first examines Aspex's arguments as to each of the four statutory bases of invalidity at issue.

1

Aspex maintains that it is entitled to summary judgment establishing that the '207 patent is not invalid under 35 U.S.C. § 102(a), which provides:

A person shall be entitled to a patent unless--(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before invention thereof by the applicant for the patent[.]

The date of invention by the patentee is critical to determining invalidity under § 102(a) because knowledge, use, patenting, or description by another before this date establishes invalidity under the statute. The date an inventor files his patent application is the presumed date of invention. *Hybritech,* 802 F.2d at 1376. A patentee may overcome this presumption based on evidence that shows an earlier date of invention. *Dow Chem. Co. v. Halliburton Co.,* 631 F.Supp. 666, 704 (N.D.Miss.1985), *aff'd,* 790 F.2d 93 (Fed.Cir.1986).

Aspex contends that, although R. Chao applied for the '207 patent on November 7, 1995, the actual date of invention is March 25, 1995, when R. Chao's brother, D. Chao, brought a prototype of the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 1751381 (N.D.Tex.))**

eyeglass device to the United States. Aspex contends that, sometime in August or September 1994, while in Taiwan, R. Chao conceived the idea behind the invention ultimately protected by the '207 patent. *See* P. MPSJ App. 612-13. He was dissatisfied with how easily front-mounted magnetic frames, or clip-on sunglasses, would disengage. After several months of discussing the idea with D. Chao, who had developed several sketches of it, R. Chao asked him to make a prototype of the invention using some components of Contour's front-mounted magnetic frames. D. Chao was in charge of product development at Contour. *See id.* at 613. He accepted the request and completed the prototype, *see id.* at 614-19, 254-59, in February or March 1995, *id.* at 240, 613. On March 25, 1995 D. Chao traveled from Taiwan to the United States taking eyewear samples, including the prototype, to show to Contour customers in this country. *Id.* at 240. According to Aspex, these facts demonstrate that the invention was reduced to practice on March 25, 1995, which therefore constitutes the date of invention. E'Lite neither disputes these facts nor does it address Aspex's argument as to the date of invention. The court therefore holds that the date of invention is March 25, 1995. [FN13]

> FN13. Although the facts indicate that R. Chao conceived the invention and reduced it to practice outside the United States earlier than March 25, 1995, the date of invention is the date it was introduced in the United States. *See, e.g., Maxwell v. KMart Corp.,* 880 F.Supp. 1323, 1334 (D.Minn.1995).

Aspex argues that E'Lite bases its anticipation claim under § 102(a) on Madison's U.S. Patent No. 6,149,269 ("the '269 patent"), for which she applied in April 1997. It contends there is no record evidence that Madison conceived her invention, or reduced it to practice, before March 25, 1995, that any admissible testimony from Madison is insufficient of itself to provide the clear and convincing evidence necessary for a reasonable trier of fact to find patent invalidity, and that, in her patent application, Madison disclosed R. Chao's patent as prior art, and it is therefore presumably incapable of being anticipated by Madison. Aspex contends that assuming *arguendo* that Madison conceived her invention before March 25, 1995,

there is no clear and convincing evidence that her invention was known or used by others or described in a printed publication before R. Chao's date of invention.

*\*19 E'Lite's response brief, which is structured somewhat incoherently and does not clearly set out the summary judgment arguments to which it is responding, [FN14] does not respond specifically to Aspex's arguments under § 102(a). It does discuss, however, Madison's invention and argues that it is evidence of anticipation generally. E'Lite contends that Madison's date of invention was sometime during the summer of 1994--before R. Chao's date of invention--and cites tabs K, L, and O of its appendix for this proposition. *See* D. MPSJ Resp. Br. at 15, 18. Tab K contains a significant portion of Madison's deposition testimony in this case, and tab L is the entire '269 patent. Because E'Lite fails to cite specifically to its appendix and to indicate particular evidence to support its assertion as to Madison's date of invention, the alleged evidence in tabs K and L is insufficient to create a genuine issue of material fact as to the timing issue.

> FN14. E'Lite adopts in its response brief its motion for partial summary judgment, the brief in support of the motion, and the supporting appendix. *See* D. MPSJ Resp. Br. at 1. A majority of E'Lite's brief supporting its motion for partial summary judgment is identical to its brief in response to Aspex's motion, and there are no additional evidence citations in the former brief that bear on the arguments that Aspex proffers in favor of summary judgment. As the court explains *supra* at note 8, it will consider these materials insofar as E'Lite has properly cited the summary judgment evidence.

Tab O is the declaration of Lynne Smith ("Smith"), an eyewear marketer. *See* D. MPSJ Resp.App. 21. Although E'Lite's brief does not contain a specific citation beyond a general reference to the declaration, the court will consider its content. The document contains only two pages of text, and the court is capable of examining it in light of E'Lite's assertions without incurring an undue burden or having to comb the record in search of a genuine issue of material fact.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

Smith states that when she visited Madison during the late spring or early summer of 1994, Madison showed her numerous drawings of new designs of magnetic eyewear that she had prepared for marketing potential eyewear products. *Id.* at 22. These drawings depicted auxiliary frames with "two arms, one on each side of the auxiliary frame, each arm having a magnet, that reached over the top of temple regions of the primary frame and connected with a magnet located either on the top or back side of the primary frame." *Id.* This evidence is offered to create a genuine issue of material fact concerning whether Madison's drawings anticipated R. Chao's later invention.

Anticipation under § 102(a) must be proved by showing that "each element of the claim in issue is found, either expressly or under principles of inherency, in a single prior art reference." *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.,* 976 F.2d 1559, 1565 (Fed.Cir.1992). "In order for a claim to be inherent in the prior art it is not sufficient that a person following the disclosure sometimes obtain the result set forth in the claim, it must invariably happen." *Glaxo, Inc. v. Novopharm Ltd.,* 830 F.Supp. 871, 874 (E.D.N.C.1993), *aff'd,* 52 F.3d 1043 (Fed.Cir.1995). The aspects of a claimed invention that always flow naturally from that which is disclosed in a prior art reference are deemed to be inherent and therefore may be anticipatory.

E'Lite has offered no evidence, however, that each element in either claim of the '207 patent was expressly or inherently known as a result of Madison's 1994 drawings. Specifically, Smith's declaration as to the nature of the drawings does not explicitly mention the projections on the primary spectacle frame, which are an essential element of the '207 patent. *See* D. MPSJ App. 6. And there is no evidence, much less evidence that could reasonably be considered clear and convincing, that drawings indicating an auxiliary arm "having a magnet" and "connected with a magnet located either on the top or back side of the primary frame" would *invariably* cause a person skilled in the art and following Madison's drawings to construct an eyeglass device with the connecting magnets secured to projections. This is in fact unlikely in view of evidence that Madison disclosed the '207 patent as a prior art reference in her own patent application, *see* P. MPSJ App. 657, which would appear to indicate that she did not view the '207

patent as invalid on the basis that it was anticipated by her drawings in 1994. Smith's declaration is therefore insufficient to allow a reasonable trier of fact to conclude that there is clear and convincing evidence that Madison's drawings anticipated R. Chao's invention and thus render the '207 patent invalid. Because E'Lite offers evidence of no other prior art reference that could be viewed as anticipating R. Chao's invention and invalidating the '207 patent under § 102(a), the court grants Aspex summary judgment as to this ground of E'Lite's counterclaim and affirmative defense of invalidity.

2

**\*20** Aspex also seeks summary judgment rejecting invalidity based on lack of inventorship. Under 35 U.S.C. § 102(f), "[a] person shall be entitled to a patent unless ... (f) he did not himself invent the subject matter sought to be patented[.]" Aspex contends that E'Lite's invalidity counterclaim and affirmative defense under this statutory bar are based on the allegation, for which it lacks evidence, that D. Chao was the sole or at least the joint inventor with R. Chao. E'Lite neither responds to this argument nor cites any supporting evidence in its response brief or its brief in support of its own motion for partial summary judgment. D. Chao denies having invented the eyeglass device at issue. *See* P. MPSJ App. 612-13. The court therefore concludes that a reasonable trier of fact could not conclude that D. Chao was the sole or joint inventor of the invention protected by the '207 patent.

Although E'Lite does not respond specifically to Aspex's argument under § 102(f), it does mention in response to other arguments what it alleges to be the prior inventions of Madison, Ovadia, and Iwamoto. If any of these individuals in fact invented the invention at issue before R. Chao did, the '207 patent would be invalid under § 102(f). But for the reasons detailed *supra,* there is insufficient evidence to allow a reasonable trier of fact to find that Madison invented the device before R. Chao. The same is true of Iwamoto. *See infra.* As to Ovadia, E'Lite merely asserts that he alleges that he "came up with the idea to change the magnetic orientation to a top-mounted design as in the '207 patent" at a meeting with D. Chao in July 1995. D. MPSJ Resp. Br. at 17. This evidence is immaterial because R. Chao's date of invention is March 25, 1995. And Ovadia's "idea" does not constitute a prior art

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

reference for the purpose of an obviousness analysis, nor does E'Lite attempt to explain how Ovadia's idea made R. Chao's invention obvious. The court therefore grants Aspex summary judgment as to E'Lite's counterclaim and affirmative defense of invalidity under § 102(f).

### 3

The court next considers whether the patent is invalid under 35 U .S.C. § 102(g)(1), which states:

> A person shall be entitled to a patent unless ... (g)(1) during the course of an interference conducted under section 135 or section 291, another inventor involved therein establishes, to the extent permitted in section 104, that before such person's invention thereof the invention was made by such other inventor and not abandoned, suppressed, or concealed[.]

Aspex contends that because of the May 2000 agreement between Contour and Pentax, E'Lite's argument that the interference between Iwamoto and R. Chao designated Iwamoto the senior party in interest does not support invalidity under this statutory bar, and that E'Lite has offered no evidence that does. E'Lite has not responded specifically to the § 102(g)(1) argument, but it does argue in its discussion of Iwamoto as a prior inventor that as a third party, it is not bound by the May 2000 agreement.

*21 Although Iwamoto was designated the senior party in the interference, after the May 2000 agreement between Contour and Pentax, the administrative judge entered judgment against Iwamoto based on the two parties' May 26, 2000 joint motion for entry of adverse judgment against senior party Iwamoto. See P. MPSJ App. 202-04. He held that the "senior party is not entitled to its application claims." Id. at 203. The interference therefore did not establish that Iwamoto invented the eyeglass device protected by the '207 patent before R. Chao did. E'Lite's argument that it is not bound by the agreement between Contour and Pentax is immaterial, because it is E'Lite's burden to establish that Iwamoto is a prior inventor, and its purported evidence is an interference proceeding in which Iwamoto's claims were ultimately denied. Because E'Lite offers no evidence of a prior inventor being established in an interference, the court grants Aspex summary judgment as to E'Lite's counterclaim and affirmative defense of invalidity under § 102(g)(1).

### 4

Aspex seeks summary judgment rejecting invalidity based on obviousness. 35 U.S.C. § 103(a) provides:

> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains[.]

Aspex contends there is no evidence that the prior art references mentioned by E'Lite's expert Hitchcock--a German patent, a Japanese patent, and Frank Sadler's ("Sadler's") U.S. Patent No. 5,416,537 ("the '537 patent")--made the '207 patent claims obvious.

According to Aspex, the German patent that Hitchcock identified does not teach an auxiliary frame arm that both reaches back over the primary spectacle frame and contains a magnetic member. See P. MPSJ App. 484-85, 497-98. It also fails to disclose the projections holding the magnetic members in the primary spectacle frame. Id. The German patent simply teaches a front-mounted method of attaching an auxiliary to a primary frame. Id. Because E'Lite does not discuss the German patent and fails to offer evidence that it made R. Chao's invention obvious, the court concurs with Aspex's summary judgment argument that it did not.

According to Aspex, the Japanese patent that Hitchcock identified also fails to teach the same elements that the German patent fails to teach. Id. at 486, 538. It simply teaches a front-mounted magnetic attachment and a separate, non-magnetic ledge to rest on the bridge of the primary frame. Id. E'Lite responds that the Japanese patent "teaches a top-down mating ... [d]eals with eyeglass frames, and [deals] with mating primary and auxiliary frames at the temple region[.]" D. MPSJ Resp. Br. at 19. It cites tab Q in its appendix, which contains the entire Japanese patent, to support this general proposition. See id. But E'Lite neither explains how the Japanese patent makes the whole subject matter of the '207 patent claims obvious, nor does it elucidate how the Japanese patent in combination with another prior art reference does so. It merely makes the ipse dixit assertion. Absent any evidence from E'Lite, the court holds that the Japanese patent does not make R. Chao's invention obvious.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**\*22** According to Aspex, Sadler's '537 patent was considered before the PTO issued the '207 patent, and the '207 patent's notice of allowance reflects that. *See* P. MPSJ App. 152. Moreover, the '537 patent teaches a front-mounted magnetic frame that lacks the unique magnetic arms and projections of R. Chao's invention. *Id.* E'Lite counters by arguing that the '537 patent teaches the use of magnets at the temple portions of the eyeglass device to mate the auxiliary spectacle frame to the primary spectacle frame. It supports this assertion by merely citing tab P of its appendix, *see* D. MPSJ Resp. Br. at 19, which contains the entire Sadler patent. Citing the entire patent to refute Aspex's specific citation to the PTO's reasons for allowing the '207 patent in light of the '537 patent is insufficient to create a genuine issue of material fact as to obviousness. The court therefore holds that the Sadler '537 patent does not render the invention at issue obvious.

E'Lite appears to argue that the alleged prior inventions of Madison, Iwamoto, Ovadia, and D. Chao made R. Chao's invention obvious and thus render the '207 patent invalid. It does not attempt, however, to explain how this is so in any of the three cases, either individually or in combination with other prior art references. Merely asserting obviousness, *see* D. MPSJ Resp. Br. at 20, is insufficient. Because E'Lite has offered no evidence of obviousness based on any prior art reference, the court grants Aspex summary judgment as to E'Lite's counterclaim and affirmative defense of invalidity under § 103(a).

5

Having granted Aspex summary judgment as to the four statutory bars in question, the court now turns to Aspex's argument in favor of summary judgment as to invalidity generally. Aspex argues that E'Lite has offered no clear and convincing evidence that would allow a reasonable trier of fact to find that the '207 patent is invalid. E'Lite offers evidence that it contends satisfies its summary judgment burden under three separate grounds for invalidity--the on sale bar, the clarity requirements of 35 U.S.C. § 112 and 37 C.F.R. § 183, and general anticipation doctrine.

Although E'Lite does not specifically mention 35 U.S.C. § 102(b), it does appear to allege the invalidity of the '207 patent based on that statute's on sale bar. *See* D. MPSJ Resp. Br. at 15 ("Madison

not only invented the claims of the '207 patent before R. Chao ... she put the invention 'on sale' under the statute."). Unlike § 102(a), which relates to the date of invention, § 102(b) relates to the critical date, which is the date one year before the filing of the patent application. Any sale or offer to sell an embodiment of the invention in the United States before the critical date is an on sale bar under § 102(b). *See Milliken Research Corp. v. Dan River, Inc.,* 739 F.2d 587, 598 (Fed.Cir.1984). In this case the critical date is November 7, 1994, and any finding that the invention claimed by the '207 patent was on sale before that date leads to invalidation of the patent.

**\*23** E'Lite's only evidence that an embodiment of all the limitations of either claim 1 or claim 2 of the '207 patent was on sale before November 7, 1994 is Smith's declaration regarding Madison's drawings. Smith avers that in approximately September or October 1994, she was present at a meeting between Madison and Bob Lapenna ("Lapenna"), an optical wholesaler, at which Madison showed her drawings to Lapenna. "The purpose of the meeting was to interest Mr. Lapenna in investing in a magnetic eyewear company to sell these designs." D. MPSJ Resp.App. 22. Smith also recalls that, at approximately the same time, she was present when Madison showed her drawings to a "Mr. Kimura" ("Kimura"), who worked for a Japanese eyewear company, and Dee Burghuys ("Burghuys"), who worked for eyewear marketer Carrera. "The purpose of these meetings was [to] interest them in manufacturing the designs." *Id.*

The initial problem with Smith's declaration as it relates to the on sale bar is that a reasonable trier of fact could not conclude from it that the drawings constitute an embodiment of all the limitations of either claim 1 or claim 2 of the '207 patent. *See supra.* Because E'Lite offers no additional evidence that would allow a reasonable trier of fact to make this finding, summary judgment in Aspex's favor as to the on sale bar is warranted.

Even assuming *arguendo* that Smith's declaration is sufficient to establish Madison's drawings as an embodiment of all the limitations of either claim 1 or claim 2 of the '207 patent, it is inadequate to establish that Madison actually placed that embodiment "on sale" before the critical date. The standard for determining whether the requirements for imposition of the on sale bar have been met is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

set out in *Pfaff v. Wells Electronics, Inc.,* 525 U.S. 55, 67-68 (1998). In *Pfaff* the Supreme Court held that the on sale bar applies when two conditions are met before the critical date. First, "the product must be the subject of a commercial offer for sale." *Id.* at 67. Second, "the invention must be ready for patenting." *Id.* The Court stated that the second condition may be satisfied in two ways: "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67-68.

E'Lite has failed to adduce evidence of either *Pfaff* condition. Smith's declaration does not indicate that Madison offered to sell a product to Lapenna, Kimura, or Berghuys; it merely indicates that she showed her drawings to them to "interest" them in perhaps designing the product in the future. Her declaration also fails to speak to the issue whether Madison's drawings were sufficiently specific to enable a person skilled in the art to practice the invention they allegedly embodied. Although Smith states that practicing the invention in 1994 was technologically feasible, *see* D. MPSJ Resp.App. 23, she does not discuss the specificity of the drawings or the ability of a person skilled in the art to practice the invention with the drawings as an aid. Because E'Lite has adduced no evidence that would allow a reasonable trier of fact to conclude that the on sale bar applies to the '207 patent, the court grants Aspex summary judgment as to any § 102(b)-based counterclaim or affirmative defense.

6

*24 E'Lite also argues that the '207 patent is invalid because it violates the clarity requirements of 35 U.S.C. § 112 and 37 C.F.R. § 183(a). Section 112 requires that a patent application enable one skilled in the art to make the invention and provide sufficiently clear claims that can be understood by those skilled in the art and not unknowingly be infringed. Section 183(a) states that "[t]he drawing in a non-provisional application must show every feature of the invention specified in the claims." E'Lite contends the '207 patent application violated either or both of these provisions in four ways and that the '207 patent is therefore invalid.

E'Lite argues that claim 1 is unreadable and

therefore invalid because it recites two separate sets of components with the single phrase "two side portions." It cites a patent practice manual in contending that such a recitation is impermissible. E'Lite makes no attempt, however, to show how this failure to follow the advice of a patent practice manual renders the patent legally invalid. The phrase "two side portions" is neither unclear nor vague, and because it is capable of being understood by one skilled in the art, it does not violate § 112.

E'Lite maintains that the phrase "upper side portion," which is used in the claim language, is neither used nor numbered in the specification. Again, the phrase is not unclear or vague, and it is capable of being understood by one skilled in the art, so its absence in the specification does not violate § 112.

E'Lite lists several terms it contends are features not identified by number in the specification or in the figures that accompany the '207 patent. E'Lite does not show, however, how the failure to identify and draw these terms as separate features renders the claim language unclear or vague, or incapable of being understood by one skilled in the art. This failure is therefore not a violation of § 112.

E'Lite posits that the term "portions" is vague, and it presents a list of terms it considers better and clearer. The existence of alternative phraseology that perhaps constitutes an improvement does not mean, however, that the wording of a patent application is sufficiently vague or unclear to render the patent invalid. E'Lite has presented no evidence that the term "portions" renders the patent incapable of being understood by one skilled in the art. The court grants Aspex summary judgment as to counterclaims or affirmative defenses of invalidity under § 112 and § 183.

7

E'Lite's final invalidity argument stems from general anticipation doctrine and rests on representations allegedly made by D. Chao to the PTO. E'Lite makes these two assertions: that D. Chao was a representative of the patentee, and that he represented to the PTO on the patentee's behalf that R. Chao was not the inventor of vertically mating, or back-mounted, frame design. From these two allegations, E'Lite appears to conclude that the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                                Page 21
(Cite as: 2002 WL 1751381 (N.D.Tex.))

patentee is estopped from claiming patent rights in vertically mating frame design, because D. Chao has admitted that any such claims were anticipated by other inventions. *See* D. MPSJ Resp. Br. at 16-17. E'Lite's evidence in support of these assertions is inadequate, however, for the argument to survive summary judgment. It merely cites to tabs G and I of its appendix. *See id.* at 16. Tab G contains the entire transcript of an interference hearing, and tab I contains the entire '747 patent. E'Lite has thus failed to cite to specific pages of its appendix to support the assertions it makes in its brief. The court will not comb the record in search of evidence that will enable E'Lite to withstand summary judgment. The court therefore grants Aspex summary judgment as to E'Lite's general anticipation argument.

**\*25** Because E'Lite has failed to adduce evidence sufficient for a reasonable trier of fact to conclude that the '207 patent is invalid, the court grants Aspex summary judgment as to E'Lite's counterclaim and affirmative defense of patent invalidity.

### B

Aspex next moves for summary judgment as to E'Lite's counterclaims for tortious interference with contract and unfair competition. Aspex contends that E'Lite has failed to adduce evidence of each of the required elements of a claim for tortious interference with contract; that both a tortious interference with contract claim and an unfair competition claim require proof of actual damages, which E'Lite's president has admitted do not exist because E'Lite in fact suffered no damages as a result of any wrongful conduct by Aspex; and that unfair competition, rather than being a specific cause of action, requires the commission of some independent tort or other illegal conduct, which in this case is tortious interference, and therefore the unfair competition claim must fail because it is dependent upon the tortious interference claim. E'Lite fails to address its tortious interference with contract and unfair competition counterclaims in its response brief.

A claim of tortious interference with existing contracts or business relationships requires (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's

injury; and (4) caused actual damage or loss. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). "The elements of tortious interference with prospective contractual relations are: (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an intentional and malicious act by the defendant that prevented the relationship from occurring with the purpose of harming the plaintiff; (3) the defendant lacked privilege or justification to do the act; and (4) actual harm or damage resulted from the defendant's interference." *Milam v. Nat'l Ins. Crime Bureau,* 989 S.W.2d 126, 131 (Tex.App.1999, no pet.) (citing *Garner v. Corpus Christi Nat'l Bank,* 944 S.W.2d 469, 477 (Tex.App.1997, writ denied). "[T]o recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful." *Wal-Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 726 (Tex.2001). Aspex has pointed to the lack of evidence as to these elements, and E'Lite has offered no evidence of any of them in response. Accordingly, the court grants Aspex summary judgment as to E'Lite's counterclaim of tortious interference with contract.

Texas law also requires the commission of an independent tort or other illegal conduct aside from a simple allegation of unfair competition. *See Taylor Publ'g Co. v. Jostens, Inc.,* 216 F.3d 465, 486 (5th Cir.2000). E'Lite's only other allegation here is tortious interference with contract, on which the court has granted Aspex summary judgment. The court therefore grants Aspex summary judgment as to E'Lite's counterclaim of unfair competition, as well.

### C

**\*26** Aspex next argues for summary judgment as to E'Lite's affirmative defenses to patent enforceability of unclean hands, laches, and estoppel. Aspex argues that E'Lite cannot prove unclean hands because it has offered no clear and convincing evidence of Aspex's having affirmatively misrepresented a material fact to the PTO with an intent to deceive, and that E'Lite cannot prove laches or estoppel because there is no evidence that E'Lite was prejudiced by Aspex's having unduly delayed in bringing its claims or induced belief that it had abandoned its claims. E'Lite fails to address its affirmative defenses as to enforceability of unclean hands, laches, and estoppel in its response

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

Page 22

brief.

To prove unclean hands, E'Lite must show that Aspex made an affirmative misrepresentation of material fact with an intent to deceive the PTO. *See Micro Chem., Inc. v. Great Plains Chem. Co.,* 103 F.3d 1538, 1549 (Fed.Cir.1997). E'Lite has not adduced evidence of such a misrepresentation, and Aspex is therefore entitled to summary judgment as to unclean hands. To prove either laches or estoppel, E'Lite must show the common element that it was prejudiced by Aspex's conduct in either unduly delaying bringing its claims or taking affirmative action to induce belief that it had abandoned its claims. *See Naxon Telesign Corp. v. Bunker Ramo Corp .,* 517 F.Supp. 804, 808 (N.D.Ill.1981), *aff'd,* 686 F.2d 1258 (7th Cir.1982). E'Lite has not adduced evidence of its being prejudiced by Aspex's conduct, and Aspex is therefore entitled to summary judgment as to laches and estoppel. Because E'Lite has offered no evidence supporting any of its affirmative defenses, the court grants Aspex summary judgment on the issue of patent enforceability.

VII

Aspex moves for summary judgment establishing that E'Lite's Smart Clip and Mac Eye models infringe the '207 patent.

A

The court first considers infringement by the 200, 500, and 800 model series of the Smart Clip. While Aspex provides a chart that cites evidence supporting infringement of each element of claim 1 of the '207 patent, *see* P. MPSJ Br. at 13-15, this evidence is not sufficient to establish beyond peradventure that such infringement occurred. The evidence cited, while it would allow a reasonable trier of fact to conclude that the Smart Clip model series infringe, is also consistent with E'Lite's argument that the frames upon which Aspex bases its allegations were manipulated into an appearance of infringement and were not representative of the models as manufactured by E'Lite. This issue must be resolved by trial. Moreover, Aspex has failed to distinguish among what evidence purports to establish infringement by the 200 model series, the 500 model series, and the 800 series. The court is therefore unable to find beyond peradventure that any model series infringes the '207 patent. The court

denies Aspex's motion as to literal infringement by the Smart Clip models.

The court also denies Aspex's motion as to infringement under the doctrine of equivalents by the Smart Clip models. Equivalence is present for a particular claim limitation if the allegedly infringing product performs substantially the same function, in substantially the same way, to obtain the same result as that described in the patent. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608 (1950). Infringement requires that the allegedly infringing product contain each limitation of the claim or its equivalent. *Warner-, Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 40 (1997) (noting that doctrine of equivalents analysis must be applied to individual claim limitations rather than invention as a whole). Aspex's evidence, while sufficient to allow a reasonable trier of fact to find in Aspex's favor at trial, is insufficient to establish infringement beyond peradventure. E'Lite has offered arguments disagreeing with Aspex's interpretations of what constitutes a difference in function or result, and this difference must be resolved by trial.

B

*27 The court next considers infringement by Mac Eye model numbers 1 through 6. Aspex provides a chart that cites evidence supporting infringement of each element of claim 1 of the '207 patent. *See* P. MPSJ Br. at 18-19. This evidence is insufficient to establish beyond peradventure that such infringement occurred. For example, although Aspex alleges that it has established that the Mac Eye models violate the claim limitation requiring a projection secured to each rear and side portion of the primary spectacle frame, its only evidence of such projections, other than unlabeled and unexplained figures accompanying a report by D. Chao, is that E'Lite expert Hitchcock said "I believe so" when asked if they were part of the Mac Eye models. *See* P. MPSJ App. 562. This alleged "admission" by Hitchcock, while certainly probative that the Mac Eye models contain the specific limitation, does not establish it to the degree necessary to warrant summary judgment. Several other items of evidence that Aspex cites as proof that the Mac Eye models contain all of claim 1's limitations are similarly insufficient to meet the standard necessary for a movant with the burden of proof to obtain summary judgment. The court

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

denies Aspex's motion as to literal infringement by the Mac Eye models.

For the same reasons discussed in its denial of summary judgment as to infringement under the doctrine of equivalents by the Smart Clip models, the court also denies Aspex's motion as to infringement under the doctrine of equivalents by the Mac Eye models.

### VIII

E'Lite moves to preclude Aspex from recovering damages before proper notice under 35 U.S.C. § 287(a). It argues that, because the products produced under the '207 patent do not bear the mark of the patent number, damages for infringement may only be recovered if the patentee has given specific notice of its belief that the alleged infringer has infringed. Based on the premise that neither Contour nor Pentax has given such notice in this case, E'Lite contends that Aspex should be precluded from recovering damages. Aspex argues that it has given E'Lite proper notice of the alleged infringement and that, as an exclusive licensee, the notice it has given is sufficient to meet the statutory requirement and overcome a motion to preclude damages.

35 U.S.C. § 287(a) states:

Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

*28 In other words, a patentee, or one practicing the invention under the patentee, must give notice in order to recover damages for infringement. The notice may take the form of either a mark on the

product--which both parties agree was absent in this case--or actual notice to the alleged infringer. Given that both parties agree that Aspex gave actual notice of alleged infringement to E'Lite, the plain language of the statute indicates that Aspex is not precluded from recovering damages in this case.

The part of the statute that addresses actual notice option does not state what specific party must give notice; it merely provides that no damages shall be recovered unless the infringer "was notified" of the infringement and then continued to infringe. The portion of the statute that pertains to notice by marking addresses how patentees or those practicing the invention under the patentee "may" give notice. This language, even viewed restrictively, must be read to allow Aspex to give proper notice in this case, because as the patentee's exclusive licensee, Aspex is "making, offering for sale, or selling within the United States" the products protected by the '207 patent.

E'Lite contends that *Lans v. Digital Equipment Corp.*, 252 F.3d 1320 (Fed.Cir.2001), mandates a different conclusion from the one that is apparent from the language of the statute. In *Lans* the Federal Circuit concluded that "notice from someone closely associated with the patentee does not satisfy § 287(a)." *Id.* at 1327. Rather, "actual notice ... 'must be an affirmative act on the part of the patentee[.]" ' *Id.* (citing *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed.Cir.1994)). E'Lite reads these holdings literally to mean that only a patentee, such as Contour, and not an exclusive licensee, such as Aspex, may give actual notice for purposes of the statute. But this reading misapprehends the reasoning in *Lans*:

[T]he purpose of the actual notice requirement is met when the recipient is notified, with sufficient specificity, that the patent holder believes that the recipient of the notice may be an infringer ." Besides alerting the alleged infringer to avoid further infringement, the notice requirement also permits the alleged infringer to contact the patentee about an amicable and early resolution of the potential dispute ... In sum, knowledge of the patentee's identity facilitates avoidance of infringement with design changes, negotiations for licenses, and even early resolution of rights in a declaratory judgment proceeding.

*Id.* (citing *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed.Cir.1997)) (citations omitted). The reason for requiring a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 1751381 (N.D.Tex.))**

Page 24

patentee, not merely someone associated with a patentee, to give actual notice is so the alleged infringer knows with whom to deal in addressing and resolving the dispute. In this case, because Aspex is the exclusive licensee with the right to sue for infringement and conduct the litigation process according to its own discretion, an alleged infringer must deal with Aspex. The rationale for requiring the patentee to be the party giving actual notice therefore supports allowing an exclusive licensee to serve as the "patentee" for purposes of § 287(a), similar to the way an exclusive licensee serves as the "patentee" for purposes of the right to sue as a coplaintiff under § 281. Such an interpretation has the added advantage of being consistent with the language of the statute. The court therefore denies E'Lite's motion to preclude Aspex from recovering damages before proper notice under 35 U.S.C. § 287(a).

IX

**\*29** E'Lite moves to strike Aspex's expert witnesses--D. Chao, Dr. Kumar, and Harry F. Manbeck, Jr., Esquire ("Manbeck")--and preclude them from testifying at trial. This is a *Daubert*-type [FN15] motion that presents the question whether the proposed testimony of each of these experts is reliable.

FN15. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 539 (1993).

A

The court may consider preliminary questions concerning the admissibility of evidence before trial. *See* Fed.R.Evid. 104(a). In performing this function, the court must at times act as a gatekeeper in determining the admissibility of expert testimony. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir.1997); *Garcia v. ColumbiaMed. Ctr. of Sherman*, 996 F.Supp. 617, 620 (E.D.Tex.1998). Rule 702 guides the court in the screening process. *See Cuevas v. E.I. DuPont De Nemours & Co.*, 956 F.Supp. 1306, 1308 (S.D.Miss.1997). Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702. The court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Watkins*, 121 F.3d at 988-89. E'Lite does not contest these experts' qualifications or the relevance of their testimony. The dispositive question is whether the evidence is reliable.

Expert testimony must be based on "scientific, technical, or other specialized knowledge." Rule 702. It must rest on a reliable foundation. *See Kumho*, 526 U.S. at 147. Because of the unique effect of an expert witness and the advantageous position he holds at trial, the proponent of the evidence must demonstrate that "the principle supports what it purports to show." *United States v. Posado*, 57 F.3d 428, 433 (5th Cir.1995). This ensures that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152; *see Garcia*, 996 F.Supp. at 620 (noting that reliability requirement ensures that knowledge offered is "supported by appropriate validation" and "establishes a standard of evidentiary reliability"). Although Rule 702 does not require absolute certainty, it does mandate that the proffered knowledge be based on "good grounds." *Posado*, 57 F.3d at 433 (quoting *Daubert*, 509 U.S. at 590). The testimony must constitute "more than belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

**\*30** In fulfilling its gatekeeping role, the court must make an objective, independent validation of the principles and methods used by the expert to ensure that they have a sound and reliable basis in the knowledge and experience of the discipline at issue. *Garcia*, 996 F.Supp. at 622. The court is not to focus on the conclusions generated by the expert's methodology. *Watkins*, 121 F.3d at 989. Instead, the court must review only the reasonableness of the expert's use of such an approach, together with his particular method of analyzing the data so obtained,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 1751381 (N.D.Tex.))**

Page 25

to draw a conclusion regarding the specific matter to which the expert testimony is directly relevant. *Kumho,* 526 U.S. at 152; *see Watkins,* 121 F.3d at 989.

When analyzing the reliability of an expert's testimony, the court may consider the following non-exclusive factors: (1) whether the expert's technique can be or has been tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Daubert,* 509 U.S. at 593-94. "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Kumho,* 526 U.S. at 151.

B

The court first considers the admissibility of D. Chao's testimony in light of *Daubert.* Neither party has briefed the *Daubert* factors individually, so the court resolves the motion based on Aspex's responses to E'Lite's specific arguments alleging deficiency and on its proof that the testimony complies with the general *Daubert* standards.

D. Chao's testimony relates to two issues--how one with ordinary skill in the art would interpret the terms of the '207 patent claims and his view whether the '207 patent has been infringed. E'Lite argues that D. Chao's opinions on both issues fail under *Daubert* because they are not based on any methodology, his views on the meaning of the claim terms contradict Manbeck's testimony, and he is incompetent to provide an opinion on infringement because he has no background either in claim interpretation or in the law of claim construction. Aspex argues that D. Chao is competent to testify on claim interpretation and infringement as one with ordinary skill in the art, that he used an appropriate methodology in developing his opinions, and that E'Lite simply misapprehends the portion of his testimony it contends contradicts Manbeck's.

E'Lite contends that instead of using a methodology, D. Chao based his determinations on what he called his "brain function." In response,

Aspex points to the specific methodology detailed by D. Chao:

In forming my opinions ... I considered the language of the '207 patent, the prosecution history of the '207 patent, and the Smart Clip and Mac Eye products illustrated in exhibits 1 through 36 attached hereto.

**\*31** D. Mot. Strike Experts Ex. B, ¶ 5. [FN16] He provided his opinion as to the meaning of certain patent terms "[b]ased on [his] knowledge and experience in the eyewear industry and of eyewear design." *Id.* at ¶ 6. The court considers this methodology--that of applying specialized knowledge and experience to the language and prosecution history of a specific patent in order to determine the meaning of its terms--to be reliable for determining how one with ordinary skill in the art would interpret the claim language of the '207 patent. Moreover, because "testimony on the ultimate issue of infringement is permissible in patent cases," *Symbol Technologies, Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1575 (Fed.Cir.1991) (citations omitted), the same methodology, supplemented by an examination of a number of Smart Clip and Mac Eye models, is admissible and reliable for determining whether those models infringe the '207 patent.

FN16. This motion should have been accompanied by an appendix that complies with Rule 7.1(i)(1), which provides that "[a] party who relies on documentary (including an affidavit, declaration, deposition, answer to interrogatory, or admission) or non-documentary evidence to support or oppose a motion must include such evidence in an appendix." E'Lite's brief should have cited the appendix in the manner prescribed by Rule 7.2(e), which states that "[i]f a party's motion or response is accompanied by an appendix, the party's brief must include citations to each page of the appendix that supports each assertion that the party makes concerning any documentary or non-documentary evidence on which the party relies to support or oppose the motion." Although the court has disregarded this defect in connection with deciding the motion to strike, its discretionary decision to do so is not inconsistent with its rulings above in which

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

Page 26

it has declined to comb the summary judgment record for evidence that has not been properly cited.

The court also considers D. Chao competent to undertake this methodology and to render ultimate opinions based on it. E'Lite's argument that D. Chao has no background in claim interpretation and that he is unfamiliar with the law of claim construction is not dispositive. "[T]he focus in construing disputed terms in claim language ... is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman,* 52 F.3d at 986. "Extrinsic evidence [such as expert testimony] may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history[.]" *Id.* at 980. The law of claim construction thus directs the court to turn to the opinions of those skilled in the art; it does not require one skilled in the art also to be skilled in the law of claim construction. Given D. Chao's skills and extensive experience in the eyewear industry, *see* P. Mot. Strike Experts Resp. Br. at 2, he is competent to opine on both the meaning of claim language and infringement.

Finally, E'Lite argues that D. Chao testified that the '207 patent claim terms have a specialized meaning whereas Manbeck said they have an ordinary meaning. Aspex contends, however, that D. Chao testified that the claim terms have an ordinary meaning. Neither party has presented evidence supporting its view regarding whether such a contradiction between D. Chao and Manbeck exists. In any event, the existence of such a contradiction does not mandate excluding D. Chao's opinion. If an expert witness' opinion is otherwise reliable, it is not rendered unreliable under *Daubert* merely because another expert for the same party holds an opinion that can be viewed as inconsistent with that conclusion. Absent evidence from Manbeck's testimony indicating D. Chao's unreliability as an expert witness, E'Lite's inconsistency argument lacks sufficient force to justify striking his testimony. The court denies E'Lite's motion to strike and preclude D. Chao's testimony.

### C

*32 The court next considers the admissibility of Dr. Kumar's testimony in light of *Daubert.* Neither party has briefed the *Daubert* factors individually. The court therefore decides the motion based on Aspex's responses to E'Lite's specific arguments alleging deficiency and on its proof that the testimony complies with the general *Daubert* standards.

Dr. Kumar's testimony relates to the issue of infringement, specifically, whether the allegedly infringing products' auxiliary frames touch the primary frames, as described in the claim limitations of the '207 patent. E'Lite argues that because Dr. Kumar used force to make the frames touch, and because the eyewear models he tested for infringement were not representative of the products E'Lite sold, his opinion on infringement is unreliable. Aspex contends that Dr. Kumar tested a random and representative sample of E'Lite's Smart Clip and Mac Eye models, and that E'Lite's arguments about forcing the frames to touch is immaterial to a *Daubert* motion because it addresses the weight, not reliability, of Dr. Kumar's testimony.

Aspex has adduced evidence that Dr. Kumar's assistant bought each of the tested E'Lite products at a Sam's Club store in Long Beach, California, and that he purchased a random sample of six different products to ensure that different model numbers were available for testing. *See* P. Mot. Strike Experts Resp.App. 54. The court holds that this is an appropriate and reliable methodology to determine whether a product infringes the '207 patent, because it involved a direct retail purchase without intervening use of the eyewear by others, and because it was performed randomly. As to Dr. Kumar's actual testing of the products to determine infringement, he testified that he used some force to make the frames touch to ensure that "the auxiliary frame was not hanging up somewhere," and that "[i]n some cases there was almost no force required." *Id.* at 55. The court also considers this to be an appropriate and reliable methodology for testing infringement, because the force was used for a particular reason and its use was disclosed, thereby allowing the trier of fact to evaluate its reasonableness and its effect on Dr. Kumar's conclusions regarding infringement.

Aspex correctly asserts that E'Lite's arguments about the nature of Dr. Kumar's samples and his use of force in determining if auxiliary and primary frames touch go to the weight that should be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

Page 27

afforded his testimony, not its reliability. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

\*33 For instance, because the purchases of the products were made directly from a retailer and were random and representative of several models, they were reliable. E'Lite may still attempt to demonstrate at trial that they were in fact not representative of the models that it manufactured. Similarly, because Dr. Kumar proffered a good reason for his use of force to see if the frames touch, and he disclosed this process, his infringement tests were reliable. E'Lite may still attempt to establish at trial that any necessity of force, for whatever reason, in making the frames touch is indicative of noninfringement. The court holds that Dr. Kumar's opinion testimony is reliable. It therefore denies E'Lite's motion to strike and preclude his trial testimony.

D

The court next considers the admissibility of Manbeck's testimony in light of *Daubert.* Neither party has briefed the *Daubert* factors individually. As before, the court resolves the motion based on Aspex's responses to E'Lite's specific arguments alleging deficiency and on its proof that the testimony complies with the general *Daubert* standards.

Manbeck is a patent attorney whose testimony relates to the issues of application of the court's claim construction and infringement. E'Lite argues that Manbeck's opinions in this case ignore the interference that is a part of the file history of the '207 patent and also fail to take account the court's earlier claim construction. Aspex denies that these assertions are valid.

Aspex has adduced evidence that Manbeck testified at length regarding the interference involving the '207 patent, *see* P. Mot. Strike Experts Resp.App. at

93-94, and that he took into account the court's claim construction when rendering his opinions, *id.* at 83-85. Because E'Lite has pointed to no other manner in which his testimony is unreliable under Rule 702, the court concludes that his testimony is reliable and consequently denies E'Lite's motion to strike and preclude his trial testimony.

E'Lite's motion to strike plaintiff's experts D. Chao, Dr. Kumar, and Manbeck is denied.

X

Aspex moves to exclude certain testimony from E'Lite's expert, Hitchcock, a patent lawyer. The parties have not briefed the *Daubert* factors individually. Aspex argues that as a matter of law, Hitchcock cannot testify on the legal issues of patent invalidity (anticipation, obviousness, and estoppel), proper claim construction, PTO procedures, and whether this is an "exceptional" case for purposes of attorney's fees. E'Lite contends that Hitchcock may testify as to each of these issues because they are mixed questions of law and fact. As with the prior motion, the court decides this motion to exclude based on E'Lite's responses to Aspex's specific arguments and on its proof that the testimony complies with the general *Daubert* standards.

The court denies as moot the part of Aspex's motion that relates to Hitchcock's validity testimony. This evidence is no longer necessary in view of the court's ruling, *see supra* at § VI(A), granting summary judgment on that issue in Aspex's favor.

\*34 Aspex correctly argues that claim construction is ultimately a question of law about which Hitchcock may not offer his legal opinion in the guise of expert testimony. *See, e.g., Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty., Ltd.,* 122 F.3d 1040, 1042 (Fed.Cir.1997) (holding that claim construction is question of law and patent lawyers cannot testify as experts by opining regarding proper claim construction). E'Lite contends, however, that Hitchcock will not testify as to his legal opinion concerning how the claims of the '207 patent ultimately should be construed. Instead, he will testify about such mixed issues of fact and law as how to reconcile the court's actual claim construction with certain prior art and what that reconciliation might have to say about future

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751381 (N.D.Tex.))

Page 28

claim construction or infringement. *See* D. Exclude Expert Resp. Br. at 5. Such testimony is permissible, *see Askanase v. Fatjo,* 130 F.3d 657, 669 (5th Cir.1997) (holding that attorneys may testify as to mixed questions of law and fact), and the Federal Circuit permits reliance on the competent expert testimony of patent lawyers as to the interplay between legal issues such as claim construction and the facts of a particular case, *see, e.g., Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1570 (Fed.Cir.1984) (permitting reliance on patent lawyer's testimony as to mixed questions of law and fact but questioning weight that should be afforded such testimony absent specific expertise in relevant art). To the extent Hitchcock limits his testimony to such mixed questions of law and fact, Aspex's motion as to Hitchcock's testimony about claim construction is denied. If, at trial, Hitchcock is asked to testify impermissibly about purely legal issues, the court will either exclude his testimony in response to a timely objection or carry the objection, allow the testimony to be adduced, and disregard it (if it is inadmissible) during the decisionmaking process. [FN17]

> FN17. It should be noted by readers of this opinion who are not parties to this case that this lawsuit will be tried to the court rather than to a jury.

Aspex also argues that Hitchcock's opinions concerning estoppel and inequitable conduct go to the ultimate issue and usurp the role of, rather than assist, the trier of fact. E'Lite points out, however, that Hitchcock will not testify as to whether the patentee is estopped from making certain claims or has engaged in inequitable conduct. Instead, he will testify concerning the implications of the '207 patent' s prosecution history, which affects legal issues such as estoppel and inequitable conduct--on other questions. Such factual or mixed testimony has the potential to assist the trier of fact in understanding what happened when and who made certain statements and at what point, and therefore is admissible. Moreover, if additional claim construction is required, Manbeck's testimony about prosecution history may be helpful. *See Markman,* 52 F.3d at 979 (granting trial court wide latitude in kinds of aids, including expert witness testimony, employed to assist in claim construction).

**\*35** Aspex also contends that Hitchcock lacks knowledge or experience in the relevant art. E'Lite points out, however, that his lack of experience does not affect the reliability of his testimony on the issues for which the testimony will be offered. Hitchcock does not propose to testify as a person of ordinary skill in the relevant art, but as a patent lawyer addressing the factual issues--many of which stem from the arguably complicated prosecution history of the '207 patent--that must be addressed before the court can reach a final conclusion regarding the legal issues. To the extent Hitchcock limits his testimony to the mixed issues of fact and law about which he possesses a special expertise as a patent attorney and does not offer expert opinions on questions that only someone in the eyewear industry would be qualified to answer, his testimony is admissible.

Aspex moves to exclude Hitchcock's testimony concerning PTO procedures based on what it alleges is a violation by E'Lite of Rule 26(a)(2)(B), which requires it to provide a "complete statement of all opinions to be expressed and the basis and reasons therefore[.]" The court is not satisfied that a sanction greater than requiring E'Lite to supplement the report is warranted on the facts presented. The court therefore denies Aspex's motion as to this aspect of Hitchcock's testimony, without prejudice to Aspex's moving separately, within 15 days of the date this memorandum opinion and order is filed, to compel supplementation if E'Lite does not agree to do so voluntarily.

Aspex also moves to exclude Hitchcock's testimony concerning whether this is an "exceptional" case concerning attorney's fees. Although this issue is a question of fact for the court to decide, *see Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1460 (Fed.Cir.1998) (en banc), it does not require precluding expert testimony on the matter since the expert may aid the factual inquiry. The court therefore denies Aspex's motion as to this aspect of Hitchcock's testimony. [FN18]

> FN18. The court notes that it will not consider attorney's fee evidence, including evidence pertaining to whether the case is "exceptional," during trial. As the court's October 25, 2000 trial docket setting order indicates, the matter of attorney's fees is handled by motion, according to the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 1751381 (N.D.Tex.))**

procedure prescribed by Rule 54(d). *See* Oct. 25, 2000 Ord. at ¶ 15. Therefore, this witness will not be heard during trial on the topic of attorney's fees or whether this case is "exceptional."

## XI

E'Lite moves to strike the testimony of Marion B. Stewart, Ph.D. ("Dr.Stewart"), whom Aspex intends to call as an expert on damages. The court considers the admissibility of his testimony in light of *Daubert.* Absent briefing on the individual *Daubert* factors, the court resolves the motion based on Aspex's responses to E'Lite's specific arguments alleging deficiency and on its proof that the testimony complies with the general *Daubert* standards.

### A

E'Lite argues that Dr. Stewart's damages testimony as to lost profits and reasonable royalties is unreliable because it is methodologically faulty. Specifically, E'Lite contends that in proffering his opinions on lost profits, Dr. Stewart did not consider the key factors of market demand for other products, noninfringing alternatives that could compete with the patented product, and alternative designs that E'Lite could sell if its current designs are deemed to infringe the '207 patent. E'Lite maintains that, in proffering his opinions on reasonable royalties Dr. Stewart used a faulty hypothetical in his methodology, conducted an incorrect analysis of E'Lite's potential design alternatives, and skewed hypothetical royalty negotiations without a good reason. Aspex denies each of these allegations and contends generally that E'Lite's arguments go to the weight, not admissibility, of the evidence.

### B

**\*36** In discussing the proper methodology that a damages expert in a patent case must employ for his testimony on lost profits to be considered reliable, E'Lite identifies four key factors to be addressed: (1) demand for the patented product, (2) the absence of acceptable noninfringing substitutes, (3) the patentee's manufacturing and marketing capability to exploit the demand, and (4) the amount of profit the patentee would have made. D. Mot.

Strike Dam. Exp. Stewart at 5. Aspex has pointed to evidence that Dr. Stewart considered each of these factors in employing his lost profits methodology. P. Resp. Mot. Strike Dam. Exp. Stewart at 3. Dr. Stewart detailed each factor at pages 4 through 9 of his report. *See* D. Mot. Strike Dam. Exp. Stewart Tab A at 4-9. [FN19]

> FN19. This motion, too, should have been supported by an appendix that E'Lite cited by page in its brief. *See supra* note 16.

E'Lite challenges Dr. Stewart's testimony under two of the four factors set out in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc .,* 575 F.2d 1152, 1156 (6th Cir.1977). As to demand for the patented product, E'Lite argues that Dr. Stewart adduced no evidence other than the sales of the patented product itself. The court disagrees. The sales are sufficient to determine demand. Dr. Stewart's methodology regarding this first factor is therefore reliable. *See, e.g., BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.,* 1 F.3d 1214, 1218-19 (Fed.Cir.1993) ("The first *Panduit* factor--demand for the patented product--presupposes that demand for the infringer's and patent owner's products is interchangeable. Under this assumption, evidence of sales of the infringing product may suffice to show *Panduit* 's first factor, 'demand for the patented product." '); *Gyromat Corp. v. Champion Spark Plug Co.,* 735 F.2d 549, 552 (Fed.Cir.1984) ("The substantial number of sales by Champion of infringing products containing the patented features itself is compelling evidence of the demand for the product.").

As to the absence of noninfringing substitutes, E'Lite asserts generally that Dr. Stewart failed to consider them properly, especially in the case of those made by an Aspex competitor, and that he relied on the instructions of Aspex's counsel in making his determinations under this factor. Dr. Stewart conducted an independent search of the magnetic eyewear industry for substitutes, and he detailed his specific opinions about the five suppliers of magnetic eyewear that he found and their products' relationship with the market for products protected by the '207 patent. *See* D. Mot. Strike Dam. Exp. Stewart Tab A at 4-9. Accordingly, Dr. Stewart's methodology is sufficiently reliable to be admissible. Although

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
**(Cite as: 2002 WL 1751381 (N.D.Tex.))**

Page 30

E'Lite devotes considerable attention to detailing specific problems it has with Dr. Stewart's analysis of potential substitutes, these concerns relate to the weight to be afforded his trial testimony. The court denies E'Lite's motion to strike Dr. Stewart's damages evidence.

### C

E'Lite's challenge to Dr. Stewart's reasonable royalties testimony fails for the same reasons. In his report, Dr. Stewart clearly details the appropriate methodology, based on the required factors, for making this type of damages assessment. *See id.* at 9-18. E'Lite's challenges to his conclusions bear upon the weight of the evidence rather than its reliability. The court denies E'Lite's motion as to Dr. Stewart's reasonable royalties testimony.

### XII

**\*37** To summarize, the court
(1) grants Aspex's September 12, 2001 motion to join any additional parties needed for a just adjudication;
(2) denies E'Lite's September 20, 2001 motion to preclude damages recovery prior to proper notice under 35 U.S.C. § 287(a);
(3) grants in part and denies in part E'Lite's September 24, 2001 motion for partial summary judgment;
(4) denies as moot E'Lite's September 24, 2001 motion to strike;
(5) denies E'Lite's September 24, 2001 motion to strike damages expert Stewart;
(6) denies E'Lite's September 24, 2001 motion to strike plaintiff's experts D. Chao, Dr. Kumar, and Manbeck;
(7) denies E'Lite's September 24, 2001 motion to dismiss for lack of standing;
(8) denies Aspex's September 24, 2001 motion to exclude certain expert testimony from Hitchcock; and
(9) grants in part and denies in part Aspex's October 2, 2001 motion for partial summary judgment.

SO ORDERED.

2002 WL 1751381 (N.D.Tex.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works